## CURTIS AUSTIN, Appellant, v. STATE OF NEVADA, Respondent.

No. 6300

December 7, 1971                 491 P.2d 724

[Rehearing denied January 10, 1972]

*Harry E. Claiborne* and *Annette R. Quintana,* of Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City; *William P. Beko,* District Attorney, Nye County, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

Convicted of possessing heroin in violation of NRS 453.030, appellant Curtis Austin contends that because the State adduced no evidence to corroborate its principal witness, Jesse Martin, and because Martin's testimony unequivocally established Martin was himself an active, corrupt participant in the criminal endeavor he ascribed to appellant Austin, the evidence against appellant was therefore insufficient to sustain his conviction in view of our legislature's pronouncement that "[a] conviction shall not be had on the testimony of an accomplice unless he is corroborated." NRS 175.291(1). We are constrained to agree.

As counsel for appellant contends, the trial transcript contains nothing inculpatory of Austin except the testimony of Jesse Martin, a heroin dealer with a lengthy and varied criminal history who, when apprehended with "a whole bunch of narcotics" several months before the incident concerned herein, had undertaken to incriminate others in exchange for cash and to avoid prosecution for his own criminal activities. Without Martin's testimony the record shows only that on October 3, 1969, Austin drove from Las Vegas to Beatty, Nevada. There, at the Exchange Club, a casino-restaurant serving also as a bus station, Austin met Tanya Edwards, who had arrived by bus from Portland, Oregon, some eight hours earlier. Austin bought a glass of milk. Then, both left the casino and entered Austin's car; Miss Edwards placed her luggage on the rear seat; police officers appeared, showed a search warrant, and found heroin concealed in a slipper in Edwards' luggage.[1]

Austin thus stands convicted of possessing narcotics which

---

[1]We can find nothing suspicious or unusual about Austin's meeting with Edwards, evidencing Austin knew Edwards possessed a quantity of narcotics. True, Beatty is approximately 115 miles from Las Vegas; however, the highway is good, for much of the way there is no posted speed limit, and Edwards apparently is an attractive woman, commonly employed as a cocktail waitress and singer. Men often embark on more arduous journeys for less reason than this. They met in a public place; Austin showed no interest in her luggage; his actions were not hurried or furtive. Indeed, the place and time of their meeting tend

arrived in Nevada with Edwards, which never thereafter came into Austin's actual possession, and over which he exercised no dominion whatever on the date of the alleged offense. Therefore, it is vital to appreciate that the conviction must be justified, if at all, on the theory that, through Martin, the State proved Austin, as owner of the narcotics, constructively possessed them through Edwards, and before her through Martin himself.[2] It is vital, we say, because without recognition of this, Martin's status as an accomplice to the crime charged cannot properly be evaluated. The rationale that one participant in a criminal scheme is culpable for the others' acts is a sword that cuts both ways. And from Martin's testimony a chronology of events emerged, principally on cross-examination, that would constitute him an active criminal participant with Austin in possession of the heroin concerned.

According to Martin, about September 23, Austin proposed that Martin leave Las Vegas "to sell narcotics for him"; Martin agreed, without learning how, where or when he was supposed to go. On September 26, Martin testified, he asked Austin about the trip; then he learned Austin wanted him to leave Las Vegas to market heroin in Portland, Oregon, a city with which Martin had no familiarity. Pursuant to instructions from Austin, he "checked the bus station and got the amount of the fares from Las Vegas to Portland and the time that the

---

more to suggest Austin did not know Edwards carried contraband than to prove that he did. It seems strange Austin, a black man, would select a small town like Beatty for a criminal rendezvous, since there blacks are a relative rarity. There are at least three answers to any suggestion that this may be explained by inferring Austin thus sought to avoid detection. First, Austin could have met Edwards any number of places in Las Vegas without the slightest prospect of apprehension. Second, if she carried contraband belonging to him and he therefore desired not to attract attention to their meeting, it is hard to understand why he did not meet her when she first arrived in Beatty. Third, if he desired to meet her outside Las Vegas, to avoid being seen with her, he could have arranged their rendezvous more conveniently at points outside but closer to Las Vegas. Thus, the circumstances of their meeting seem to us to have no incriminating significance.

It may also be noted that even if there were independent evidence to show Austin knew Edwards was likely to possess narcotics (and there is not), it would remain most doubtful that his knowing association with a probable narcotics violater would justify any reasonable inference that Austin himself was guilty of criminal misconduct. Cf. Sibron v. New York, 392 U.S. 40, 62 (1967).

[2] Our brother Thompson seems to recognize this, for his opinion is grounded on the concept that Austin was deemed to have the same possession as any person possessing the narcotics pursuant to his direction.

bus would leave." At 6:00 p.m. that evening, Martin met Austin and Edwards; "she said yes she was ready to go"; "then Austin told me be ready at 9 o'clock." At this point, according to Martin, he "went home and called the police department." However, what he told the police at this juncture is not clear.

As Martin's story proceeded, Austin and Edwards picked him up in Austin's car; Austin stopped, went into the desert, came back and gave Martin ten balloons containing 20 heroin capsules each, a total of 200 "caps," retail value $5 each, a total of $1,000. Then Austin drove them to Beatty, where Martin last saw him "approximately 11 o'clock that night on the 26th" when Austin gave Edwards money to purchase their tickets to Portland. Upon arrival there about 10:00 p.m. September 27, they rode around in a taxi an hour or so, then took separate motel rooms. Thereupon, Martin went out to find where the "fast action" was. (As Martin said Edwards did nothing after their arrival, except to hold some of the heroin Martin transported there, Martin's story does not account for why Austin sent her along, as supposedly he did.)

Martin first said he had no money when they arrived, then said he had less than $30; he stayed eight days; still, he claimed he sold no narcotics. Instead, he said, he proceeded to search out addicts and give the narcotics away, leaving with Edwards all that he did not take with him "down on the street." (Considering expenses necessarily inherent in the venture, it is hard to see how Austin could profit from it, even had Martin sold everything supposedly entrusted to him.)

Martin explained he gave away the narcotics because Austin told him to generate business by distributing samples. He kept giving them away, he said, because no "contact" appeared to show him the ropes, as Austin supposedly had promised. Yet it was apparent Martin needed no one to show him the ropes; he is justifiably proud of his own expertise in the narcotics trade.[3] Probably because he could not explain his survival in any other way, he admitted that he accepted meals and favors from addicts he "raised," but denied accepting money. He was communicating with the Las Vegas police, he claimed,

---

[3]Consider the following excerpt from cross-examination of Martin:
"Q. So, you just looked over the crowd and if you saw a fellow you thought was an addict you just— A. If I saw one that I knew was an addict. Q. You are deft enough that you can look at a man and tell he is an addict? A. Well, I would say I have a fair knowledge of it. Q. You have that much knowledge of the traffic you can look at a man and tell whether he is an addict or not, right? A. Well, I did that time."

but did not tell them of his own criminal activities because he "figured it was none of their concern." His own activities, he said, were not a crime if he "didn't get caught." (Inasmuch as Martin did not tell the police what he was actually doing in Portland, and Edwards concededly did not actively participate in Martin's criminal pursuits, what truthful information he could have reported to the police is something of a mystery.)[4]

According to Martin, only four days after Edwards and Martin arrived in Portland, Austin became disgruntled because Martin was not making any money there, and directed that Edwards should return with such narcotics as were undistributed. (Martin testified that the night before Edwards left—which would have been October 1, as she had to leave Portland October 2, to arrive in Beatty October 3—he was with her when she called Austin. This testimony was at odds with that given at the preliminary hearing, when Martin testified he was present only at the time Edwards called Austin from the bus depot on arrival.) When Austin asked that Edwards return, Martin allowed her to leave with seven balloons of

---

[4]Martin's testimony would establish that his actions, including his own knowingly criminal endeavors, were within the scope of the plan he claims to have entered into with Austin: "Q. What were your directions by Mr. Austin to do when you went up there if you were taking that heroin up there for him, what were your directions by him to do with it? A. Just what I did with it except he told me to give out some samples and let the guys on the street know what I had, and then they would start to buy. But I never did sell any. Q. That's all the instructions you had? A. Well, except someone was suppose [sic] to contact me and show me the ropes, the ins and outs, and all, which never did happen. Q. He told you someone would contact you and show you all the ropes? A. Yes. Q. And nobody showed up? A. No. . . . Q. So, then, you went on your own to give it away? A. No, I wasn't giving it away on my own; I was giving it away because he told me to. Q. Because he told you to? A. To give out some samples, and that is what I was doing. Q. Does that seem reasonable, Mr. Martin, that he would tell you somebody would contact you up there and show you the ropes and then he would tell you to go out on your own and give it away? A. Well, I guess it seemed reasonable enough to me, I guess, because nobody contacted me. . . . Q. But you did go out and stay with addicts during the night and they bought meals and everything for you. And you, instead of charging them for the heroin, you would give it to them? A. Yes, I gave it to them. Q. Did you know at the time that you were furnishing heroin to those addicts you were violating the Oregon state law? A. Well, they didn't catch me at it. . . . Q. Well, that was my question. You didn't know it was a violation or a felony in Oregon to give it away to anybody? A. (No response.) Q. Right? A. Are you still waiting for an answer? I thought I answered you. No, I wasn't really too concerned about whether it was a violation or not. I didn't think it was a violation if I didn't get caught at it, at least."

heroin (140 "caps"). Of the balance that he retained, he says he supplied one balloon (20 "caps") to the police; he "gave away" the contents of the other balloons (40 "caps") over the course of his stay. Martin testified he was in Edwards' motel room on October 2 as she finished packing, and saw her pack the balance of the narcotics that Martin had given her. When she departed, he called the bus station, ascertained when her bus would depart Portland and arrive in Beatty, and called the police in Las Vegas to tell them where Edwards had packed the narcotics he had given her, and where to be to arrest her and Austin.[5]

The police apparently did not know that, in fact, Martin had been purveying heroin in Portland; for they obtained a search warrant upon an affidavit that assumed Martin was merely keeping Miss Edwards and the narcotics under surveillance. Martin's testimony does establish, however, that he was a heroin dealer, and had been well over a year before his alleged transaction with Austin. Some three months before events involved in Austin's conviction, Martin admitted, he was apprehended with 56 "caps" of heroin; then, to avoid prosecution, he undertook to incriminate others, and supplied or fabricated evidence on at least one other associate besides Austin and Edwards. From testimony of police officers as well as Martin it is clear that in exchange for Martin's co-operation and testimony, the police gave Martin money when he requested it, and refrained from prosecuting him.[6]

---

[5]Martin's testimony did not explain why Austin should become disgruntled over Martin's failure to make money, which is strange when one recalls Martin was supposedly giving away the narcotics because Austin told him to, and Austin never arranged the promised "contact" to help Martin begin to make sales. It is also interesting that while any police plan to capture Austin with narcotics in Nevada was necessarily dependent from its inception upon the narcotics being returned here, Martin's story attributed their return to Austin's spontaneous decision, and attributed that decision to Austin's self-inflicted disgruntlement with the venture. It is also curious that, although Martin said he saw where the narcotics were packed and told the police, they did not find them immediately when they conducted their search in Beatty. Only after failing to find them on the first search of Edwards' effects did they ultimately find contraband in the toe of her slipper.

[6]On this point, cross-examination of Martin proceeded:
"Q. How much did you have on you when they caught you? A. Oh, I think it was something like 56 caps, I think. Q. Of heroin? A. Yes. Q. Where did they catch you? A. F Street and Jackson. Q. Did they throw you in jail? A. Yes. Q. And then they made a deal with you, didn't they? A. Well, what do you mean when you say they made a deal? Q. Well, they made a deal with you that you would go free if you catch other people, testify against them and throw

The courts have long recognized not only that the uncorroborated testimony of an accomplice has doubtful worth, but that his incrimination of another is not corroborated simply because he accurately describes the crime or the circumstances thereof.[7] Our legislature, as legislatures in a multitude of other states, has codified this historic view. NRS 175.291 provides:

"1. A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.

"2. An accomplice is hereby defined as one who is liable to prosecution, for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

It is therefore apparent: first, NRS 175.291(1) requires us to consider whether Martin has been adequately corroborated, assuming he is an "accomplice"; and, second, if no "corroboration" is found, NRS 175.291(2) requires us to decide whether Martin's participation in the criminal endeavor he attributed to Austin constituted Martin an "accomplice." We will consider these issues in the order stated.

---

everybody else in jail to save yourself? A. They didn't say that. Q. Well, what did they do with you? Do you have a case pending? A. No, I don't have no case pending so far as I know. Q. They dropped it all on you, didn't they? A. Well, let me answer that this way: They said that they would make recommendations to the District Judge for me. Q. Well, you have never been in front of a District Judge, have you? A. Pardon? Q. You have never been in front of a District Judge, have you, on your own case? A. No, so far I haven't. Q. And they haven't go[t] a case pending against you now, have they? A. No, they don't have. Q. You got it all dropped, didn't you? A. Yes."

Martin also testified:

"Q. Now, you have sold quite a bit of heroin in your time, haven't you? A. Not too much. Q. But you have sold quite a bit, haven't you? A. Not too much. Q. Well, what do you call too much? A. What do you call quite a bit? Q. Well, how much have you sold? A. Well, I don't remember."

[7]1837, Lord Abinger, C.B., in R. v. Farler, 8 C.&P. 106: "A man who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only on the truth of that history, without identifying the person, that is really no corroboration at all."

1826, Bushe, C. J., and others, in R. v. Sheehan, Jebb 54, 57, thought "that 'ex concesso' an accomplice was concerned in the crime and knew all the facts . . ."

1. *Could Austin's proximity to Edwards constitute "corroboration" of testimony by Martin showing that Austin knew she possessed narcotics, that Austin owned the narcotics, and that Austin therefore constructively possessed them through Edwards?*

Under statutes such as NRS 175.291 it is commonly held that "corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused." People v. Shaw, 112 P.2d 241, 255 (Cal. 1941), and cases there cited; Cooper v. Territory, 91 P. 1032 (Okla. 1907). As the California Supreme Court said in People v. Shaw, supra, citing numerous authorities:

"The difficulty comes in determining what corroboration is sufficient. First, we must eliminate from the case the evidence of the accomplice, and then examine the evidence of the remaining witness or witnesses with the view to ascertain if there be inculpatory evidence, —evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him." Id., at 255; emphasis in original.

This seems the approach the courts have uniformly taken to application of statutes like NRS 175.291; indeed, it seems the only approach available. How else may we implement the legislative edict that there must be corroborative evidence "which *in itself*" tends to connect the defendant with the commission of the offense *"without* the aid of the testimony of the accomplice"? How else may we honor the legislative mandate that "corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof"?

Implicitly recognizing the propriety of the aforedescribed approach to application of NRS 175.291, this court held in Ex parte Hutchinson, 76 Nev. 478, 357 P.2d 589 (1960), that an accomplice was not sufficiently corroborated, even to show probable cause to hold for trial, merely by showing the defendant was with the accomplice near the scene of the crime on the night it was committed, at the time the accomplice testified they committed it in concert.[8] Similarly, as Austin's

---

[8] A recent case similar to *Hutchinson* and to the one before us is State v. Jones, 465 P.2d 719 (Ore.App. 1970). There, the court held testimony showing only that a burglary was committed, that the defendant had been in the store in question earlier on the same evening as the burglary, and that later that evening the defendant was still in

proximity to Edwards is not independent *inculpatory* evidence connecting him to her possession of heroin, therefore if Martin's testimony establishes himself as an accomplice of Austin, then, as appellant's counsel contends, the evidence adduced against him was insufficient. This is the mandate of our legislature. As this court said in another case involving the same statute, "if re-examination is now to be had it should . . . be by legislative rather than judicial act." Ex parte Sullivan, 71 Nev. 90, 93, 280 P.2d 965, 966 (1955).

The State's only response to this is summarized in, and almost limited to, one sentence in its answering brief: "The law does not require corroboration of an informant." Thus, it seems fair to say that lack of "corroboration" is conceded, so that Austin's conviction may not stand if Martin was an "accomplice" within the meaning of our legislature's mandate. We pass to consideration of this second issue.

2. *As Martin described the criminal endeavor in which he incriminated Austin, was Martin within the statutory definition of an "accomplice"; and, if so, may application of NRS 175.-291 properly be avoided, as the minority opinion suggests, by saying that Martin was at the most a "feigned accomplice"?*

NRS 175.291(2) defines an "accomplice" as "one who is liable to prosecution, for the identical offense," but inasmuch as the statute does not specify that an "accomplice" must be liable to prosecution for the same offense *in Nevada,* a strong argument could be framed that Martin would be an "accomplice" if his testimony merely established that in concert with acts justifying prosecution of Austin in Nevada, Martin rendered himself liable to prosecution for possession of the same heroin in Oregon, or elsewhere. It is, however, unnecessary to decide this question, because it is clear Martin's acts were such as to render him subject to prosecution, together with Austin, on the same charge in Nevada. NRS 194.020(1)(3)(5); NRS 195.020; State v. Chapman, 6 Nev. 320 (1871); State v. Cushing, 61 Nev. 132, 120 P.2d 208 (1941).

---

town with accomplices and others, was not sufficient corroboration of accomplices' testimony to support defendant's conviction for the burglary. In so holding, the court quoted (id., at 720) from State v. Carroll, 444 P.2d 1006, 1007 (Ore. 1968): ". . . Before independent evidence of defendant's association with an admitted accomplice will furnish the corroboration necessary, it must appear that the defendant and the accomplice were together at a place and under circumstances not likely to have occurred unless there was a criminal concert between them."

It is equally clear that Martin was not merely a "feigned accomplice" because, unlike situations concerned in the cases cited in the minority opinion, Martin's testimony shows unequivocally that he participated criminally in the activities he described to incriminate Austin. Indeed, Martin is the only person who incontestably possessed the heroin and used it criminally. As this court said in State v. Verganadis, 50 Nev. 1, 248 P. 900 (1926), one of the cases to which our brother Thompson has referred us:

" 'Where the voluntary cooperation in the commission of a crime is admitted,' says Mr. Wharton in his work on Criminal Evidence, vol. 1 (10th ed.) sec. 440, 'the court may charge the jury that the witness is an accomplice; but where the evidence is conflicting as to the manner of cooperation, the question as to whether or not the witness is an accomplice should be submitted to the jury, under instructions as to voluntary or real cooperation in the commission of the offense charged.' " 50 Nev., at 7–8. Thus, neither the *Verganadis* case, nor others in which this court has considered the subject of feigned accomplices, are in point on the matter before us. Unlike the informant in *Verganadis,* whom this court said was not an accomplice "for the reason that there was no criminal intent on his part," Martin was not merely feigning participation. He was a criminal with criminal intent, playing both sides, for his own purposes, and not to further the ends of justice. The police obviously could not, and apparently did not, sanction Martin's criminal acts. Martin purveyed narcotics, not to aid the police, and not because compelled by the exigencies of the situation in which he found himself. About this, we believe, reasonable men cannot differ.

It is Martin's criminal intent, not his intent to betray Austin, that is decisive of his status. "An accomplice is 'one culpably implicated in, or who unlawfully co-operates, aids, abets, or insists in, the commission of the crime charged.' " 2 Wharton's Crim. Ev. § 448 (12th ed. 1955). "The test as to whether one is an accomplice is whether his participation in the offense has been criminally corrupt." Blake v. State, 24 P.2d 362 (Okla. Crim.App. 1933). In Savage v. State, 170 S.W. 730 (Tex. Crim.App. 1914), where a witness testified the defendant had offered to bribe him to leave the country, and that the witness actually left as agreed, but with intent of betraying the defendant to the police, the court said:

"It is useless for the court to assume, under the circumstances and statements as made by this witness, that there was any question or issue as to his being an accomplice. . . .

Under this witness' evidence, he went into a scheme to work up a case against these parties at the beginning in order to get them into trouble, and that, having done so, he accepted the money and railroad ticket and agreed to leave the country, and did start to El Paso, and later on did in another instance leave the country, and he testifies that appellant Savage sent him money to different points in Texas, California, and Arizona to keep him out of the country in the latter instance. There could be no question that Barkley was an accomplice, made so by his own testimony. The court should have instructed the jury positively that he was an accomplice." 170 S.W., at 733. Accord: Carr v. State, 82 S.W.2d 667 (Tex. Crim.App. 1935).

We view the instant matter in much the same light. As Martin's testimony left no doubt his participation was criminally corrupt, the court erred in permitting the jury to determine he was a feigned accomplice only, and to ignore our legislature's requirement of corroboration. Whether the jury reached their verdict on this basis, or some other, Martin's testimony alone was insufficient to support it.

We perceive no other way to view the matter. If the distinction between an actual accomplice and a "feigned accomplice" does not depend on whether the informer participates with criminal intent, or merely feigns it, then on what does the distinction depend? What are we talking about "feigning," if not the criminal intent? The distinction surely cannot depend upon whether the informer harbored, at the time of his own criminal acts, intent to betray supposed confederates to the police if it should seem expedient to do so. Nor can it turn on whether, before performing his own criminal acts, the informer took the precaution to tell the authorities of his intent to betray his confederates. We believe we are concerned with whether Martin's criminality was feigned, not with whether his loyalty was.

By NRS 175.291, our legislature has declared that one who has participated criminally in a given criminal venture shall be deemed to have such character, and such motives, that his testimony alone shall not rise to the dignity of proof beyond a reasonable doubt. To this legislative policy we must give meaningful effect.[9]

Accordingly, appellant's conviction must be and hereby is

---

[9] The minority opinion suggests "the fault" in our reasoning is that we deny the jury's right to find an informer is a "feigned accomplice" although his own testimony unequivocally establishes him as a real accomplice. This "fault" is in accord with our precedents. Cf. State v.

reversed. It is clear that, upon the present record, by virtue of NRS 175.291, there is insufficient evidence to hold appellant to answer for the crime with which he stands charged. Ex parte Hutchinson, 76 Nev. 478, 357 P.2d 589 (1960). Thus, the charge against appellant is hereby dismissed, and he is hereby discharged from custody.[10] However, as we wish to afford the State an opportunity to prosecute appellant, in the event evidence to corroborate Martin is available, dismissal of the charge against appellant shall be without prejudice to institution of other criminal proceedings against him.

While other assignments of error have been raised, it is unnecessary to decide them.

ZENOFF, C. J., and BATJER, J., concur.

THOMPSON, J., with whom MOWBRAY, J., agrees, dissenting:

1. Our Constitution limits the appellate jurisdiction of this court in criminal cases to questions of law alone. Nev. Const. art 6, § 4; State v. Millain, 3 Nev. 409 (1867); State v. Fitch, 65 Nev. 668, 680, 200 P.2d 991 (1948); State v. Butner, 66 Nev. 127, 131, 206 P.2d 253 (1949). This command is to be obeyed, and denies our right to intrude upon the function of the jury to weigh, evaluate and credit the testimony of a witness or witnesses. The fault of the majority opinion lies in its acceptance of the whole of the testimony of the witness Martin as being true, and upon that premise concluding that he was a real as distinguished from a feigned accomplice. The jury was not compelled to credit all of the testimony given by Martin. It was entirely free to accept a portion of

Pray, 64 Nev. 179, 179 P.2d 449 (1947), deciding that a witness's testimony showed her to be an accomplice as a matter of law and, since her testimony was not sufficiently corroborated, reversing a verdict against the defendant without allowing the State an opportunity to re-try him. Cf. In re Oxley and Mulvaney, 38 Nev. 379, 149 P. 992 (1915), as well as Ex parte Hutchinson and Ex parte Sullivan, supra, in which this court would not even allow a trial upon the uncorroborated evidence of witnesses whose testimony established them as accomplices.

[10]Tanya Edwards, who arrived in Beatty with the heroin, was convicted of the offense concerned and has not appealed. She did not take the witness stand, either to defend herself or to accuse Austin. Austin testified at length, denying complicity with her and Martin. While the minority opinion suggests that lack of the corroboration required by NRS 175.291 is somehow rendered less important by the fact that Austin denied complicity with Martin, we cannot see how uncorroborated testimony becomes more trustworthy because it is contradicted, nor where there is any latitude in the statute for a distinction of such character.

his story and disbelieve the rest. People v. Davis, 309 P.2d 1 (Cal. 1957); People v. Matlock, 336 P.2d 505 (Cal. 1959); People v. Bodkin, 16 Cal.Rptr. 506 (Cal.App. 1961). And, although the State may have been bound by the evidence given by Martin, the jury, as the trier of the facts, was not. State v. Fuchs, 78 Nev. 63, 368 P.2d 869 (1962). Accordingly, it was permissible for the jury to reject that portion of Martin's testimony inculpating him with Austin, and to accept, as true, other testimony offered by him. Martin's implication of Austin was, by Austin, denied. The evidence was in direct conflict as to Austin's involvement. It was the jury's task to resolve that conflict under proper instructions from the court.

2. Of course it is true that the testimony of a real accomplice must be corroborated in order to justify a conviction. NRS 175.291. It is equally true, however, that the testimony of one who is a feigned accomplice need not be corroborated, and if believed in relevant part, will support a conviction. State v. Verganadis, 50 Nev. 1, 7, 248 P. 900 (1926); State v. Smith, 33 Nev. 438, 447, 117 P. 19 (1910); see also Ex parte Colton, 72 Nev. 83, 87, 295 P.2d 383 (1956); Tellis v. State, 84 Nev. 587, 445 P.2d 938 (1968). Whether the witness is a real or a feigned accomplice is a jury question to be resolved under appropriate instructions, State v. Verganadis, supra, and the finding of the jury is conclusive, Smith v. State, supra. This is particularly true when the evidence is in conflict. Appropriate instructions were given in this case.

3. Martin testified that he had alerted the police that Austin and Tanya Edwards were to meet in Beatty, Nevada, on a certain day and that Tanya would have the narcotics in her possession. Moreover, his testimony, if believed, established that the narcotics originally belonged to Austin and were being redelivered to him by Tanya. Austin did meet Tanya in Beatty on that day and she did have the narcotics in her possession. In short, the events which transpired gave credit to that aspect of Martin's testimony and, as to that aspect, it was permissible for the jury to believe that Martin was a feigned accomplice who voluntarily cooperated with law enforcement to aid justice by detecting a crime.

4. Austin contends that the State failed to prove his possession of the narcotics. He had driven to Beatty to meet Tanya who had the narcotics in her handbag. As they started to drive away in Austin's automobile the police intervened, exhibited a search warrant, searched the car and the handbag, found the narcotics, and placed Austin and Tanya under arrest.

Austin was never observed physically to have taken the handbag into personal custody. However, if the narcotics were Austin's, as Martin testified, Austin would be deemed to have the same possession as any person possessing the narcotics pursuant to his direction, since he retained the right to exercise dominion and control. People v. White, 325 P.2d 985 (Cal. 1958).

5. The jury's verdict in this case should be sustained. We have no business setting aside factual determinations. The majority opinion paints the witness Martin as a rascal and then accepts his testimony as entirely true in order to rule as a matter of law, that he was a real accomplice as to all phases of the transaction whether in Oregon or Nevada. The jury was not obliged to so treat his testimony. It could sift, evaluate, accept some of it and reject the balance. The jury apparently accepted Martin's advice to the police that a crime would occur in Beatty because it did happen precisely as he said it would. I find no legal error in that decision.