ROBERT RYAN ROWLAND, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 34552

January 24, 2002                                    39 P.3d 114

---

[11]111 Nev. 567, 571-75, 894 P.2d 354, 357-59 (1995).

[12]*Id.* at 571-72, 894 P.2d at 357.

[13]*See supra* note 8.

*Steven G. McGuire,* State Public Defender, and *Harriet E. Cummings,* Deputy Public Defender, Carson City, for Appellant.

*Frankie Sue Del Papa,* Attorney General, *David F. Sarnowski,* Chief Deputy Attorney General, and *Dorothy Nash Holmes,* Deputy Attorney General, Carson City; *Noel S. Waters,* District Attorney, Carson City, for Respondent.

# OPINION

*Per Curiam:*

Appellant Robert Ryan Rowland and co-conspirators, who were part of a prison gang known as GFBD ("God Forgives, Brothers Don't"), murdered and robbed Nevada State Prison inmate Steven Bruce Silva on January 19, 1998. Rowland was tried with one of the co-conspirators, Tony Martin Smith. They were convicted and sentenced to life without parole. Rowland contends that a number of errors occurred in the district court. We conclude that none of Rowland's assignments of error warrant relief, and we affirm the judgment of conviction and sentence of life without parole.

## FACTS

### I. *Guilt phase*

A jury trial commenced on April 15, 1999. Two of Rowland's co-conspirators were not tried for Silva's murder, Juan Pedro LaPeire and Ricky Irvine. LaPeire pleaded guilty to conspiracy to commit grand larceny, for which he was sentenced to time served, and then testified for the State at the trial of Rowland and Smith. Irvine testified at the grand jury hearing, but was dismissed from the case when he committed suicide in his cell after a local newspaper had revealed that he had testified.

On January 19, 1998, inmate Silva was found badly beaten in his cell. Paramedics transported Silva to the Carson-Tahoe Hospital, where he died from multiple injuries of blunt-force trauma.

Officer Rod Moore, who began investigating the crime shortly after its occurrence, heard that Irvine had exhibited some strange behavior after the incident and had claimed to know who committed the crime. During an interview Irvine told Officer Moore, "I know who did it," and told him to "go check [Rowland's] hands." Officer Moore visited Rowland and without telling him why he was checking his hands, Officer Moore observed that his knuckles were red, but saw no abrasions.

Officers conducted a search of the entire unit and found evidence connecting the four suspects to the crime. In Silva's cell, a note saying "expect no mercy" from an unidentified writer was

found. Inmate LaPeire, Rowland's cellmate, testified that he believed that this note was in Rowland's handwriting. A Walkman and a television set, which belonged to Silva, were found in Irvine's cell. A fan, allegedly belonging to Silva, was found in Smith's cell. Gloves were found in both Rowland's and Smith's cells.

No guards witnessed what happened to Silva, but several inmate witnesses testified regarding the events. LaPeire testified that he went to a meeting in Smith's cell the night before the murder to plan the attack on Silva with Rowland, Smith, and Irvine. According to LaPeire, Rowland and Smith were upset with Silva because Silva would not give his methadone pills to them. LaPeire served as a lookout during the attack and helped carry Silva's property after the incident. After the attack on Silva, LaPeire told the investigators that he and Rowland were in their cell the entire time, but he later confessed, asserting that Rowland concocted this lie for him.

Inmate Rick Ebel, Silva's cellmate testified that he was in Silva's cell when Rowland, Smith, and Irvine kicked in the door and told Ebel to "[g]et out." Ebel stated that he jumped out of the cell but stood next to the doorway to observe what was happening. Meanwhile, Ebel heard Rowland tell Silva, "[y]ou're getting taxed, mother-fucker." Ebel testified that Rowland punched and Smith kicked Silva while Irvine stuffed Silva's property in a laundry bag. Ebel stated that after the attack, inmate David Baker came over from a nearby cell to administer CPR on Silva while Ebel sought help. Ebel also went to the cell where Rowland, Smith, and a third person were talking and told them, "I think he's dead," to which either Rowland or Smith responded, "[w]ell just keep your mouth shut." Ebel admitted that he denied any involvement for months until he was put in solitary confinement for six or seven months as a result of the crime and his suspected involvement. He also admitted that he had a reputation as a big mouth and admitted that part of his motive for testifying was that he was a suspect, and he wanted to avoid being charged with the murder.

Inmate Richard Williams Watson, who lived in the cell across from Silva's, testified that he saw Rowland punching Silva while wearing gloves, Smith holding a laundry bag of Silva's belongings, and heard Rowland yell to Baker that "he might be dead." Watson admitted that he did not tell the whole story when he was first interviewed by investigators. In exchange for his testimony, the prosecution wrote letters to the parole board on his behalf and he received a 90-day credit toward his sentence. After Watson agreed to testify, Rowland attacked him on a prison bus on April 1, 1998, and threatened to cut his throat if he testified.

Inmate James Reid testified that on the day of the murder, he was making a phone call in the unit where the murder occurred, and from that vantage point, he could see the area where Silva's cell was located. Reid stated that he saw Smith, Irvine, and LaPeire leaving Silva's cell carrying property in laundry bags. Reid also saw Rowland exiting Silva's cell carrying a shirt. Reid admitted that he had lied to the investigators the first two times he was interviewed because he was afraid of the consequences he might suffer if he was labeled a "snitch."

Inmate Timothy Wade, Silva's former cellmate, testified that he was using the phone in Unit 6 when the attack on Silva occurred. Wade saw Smith and Rowland enter the rotunda on the way down to Silva's cell and Smith yelled to Wade, "mind your own business," which was picked up on the prison telephone recording system. Wade went to Smith's cell and while Smith was cleaning himself off, Smith told Wade that if Silva paid his debts he could get his stuff back and he retorted to Wade that, "[y]ou don't even like that dude." After providing investigators with information about the crime, Wade said that GFBD members attacked him in the prison yard. Initially, Wade refused to speak with investigators, but agreed to testify only if he was provided protection.

Inmate Ricky Egberto testified that when he was in the prison infirmary with Smith and Rowland six weeks after the murder, Smith and Rowland admitted that they had beaten Silva over a drug debt and that Irvine was going to take the blame. Inmate David Springfield testified that on the day of the murder he saw Rowland leave Silva's cell red-faced with gloves on and saw Smith and Irvine carrying items out. Inmate Allen Clingempeel testified that after Irvine committed suicide, Smith, with Rowland present, told Clingempeel to say that Irvine confessed to the murder.

Rowland did not set forth any affirmative defenses and chose not to testify at trial. Instead, Rowland chose to hold the State to its burden of proof. Thus, Rowland's defense consisted primarily of attacking Watson's credibility by offering testimony of several officers who stated that Watson had failed to alert them to any possible trouble with Rowland, contrary to Watson's testimony.

On the other hand, Smith's defense was that he was not at the scene when the crime occurred. Smith chose to testify. In addition, inmates Ronnie Johnson and Jason Jones testified as to Smith's alibi. Specifically, Johnson testified that at the time of Silva's attack, Smith was with him near the handball courts after he had just been to the visiting area to see his ex-wife and son. Jones testified that he witnessed the attack but that he did not see Smith present at the time of the attack. The State discredited Jones's testimony with rebuttal witness inmate Richard Scott, who testified that Jones was playing cards with him during the attack on Silva.

On May 4, 1998, the jury returned guilty verdicts against Rowland and Smith for first-degree murder, robbery, burglary, and conspiracy to commit robbery.

## II. *Penalty phase*

The penalty hearing began on the following day and Rowland filed a motion to dismiss the jury or at least take a two-week hiatus before proceeding with the penalty phase because some of the jurors expressed concern for their safety. The district court denied the motion.

At the penalty hearing, Smith elected not to testify. However, Rowland chose to testify and admitted hitting Silva but denied intending to kill him.

After weighing the various mitigating and aggravating circumstances, the jury rejected the death penalty, imposing a sentence on both Rowland and Smith of life without the possibility of parole. On July 21, 1999, the district court formally sentenced Rowland to various terms of life without the possibility of parole.

## DISCUSSION

### I. *The conduct of the prosecutor*

Rowland contends that the prosecutor engaged in numerous instances of misconduct throughout the guilt and penalty phases of his trial. Rowland, however, failed to object to most of the prosecutor's comments he now challenges. This court has long held that, as a general rule, "the failure to make timely objections [to prosecutorial misconduct] and to seek corrective instructions during trial [precludes appellate consideration]."[1] But we may consider sua sponte plain error which affects the defendant's substantial rights, if the error either: "(1) had a prejudicial impact on the verdict when viewed in context of the trial as a whole, or (2) seriously affects the integrity or public reputation of the judicial proceedings."[2]

"The level of misconduct necessary to reverse a conviction depends upon how strong and convincing is the evidence of guilt."[3] "If the issue of guilt or innocence is close, if the state's case is not strong, prosecutor misconduct will probably be considered prejudicial."[4]

[1]*Pray v. State,* 114 Nev. 455, 459, 959 P.2d 530, 532 (1998).

[2]*Libby v. State,* 109 Nev. 905, 911, 859 P.2d 1050, 1054 (1993), *vacated on other grounds,* 516 U.S. 1037 (1996); *see also* NRS 178.602.

[3]*Oade v. State,* 114 Nev. 619, 624, 960 P.2d 336, 339-40 (1998).

[4]*Garner v. State,* 78 Nev. 366, 374, 374 P.2d 525, 530 (1962).

Rowland claims that the prosecutor vouched for the credibility of four state witnesses on several occasions during the closing argument of the guilt phase. We have held that the prosecutor calling a witness a liar is improper[5] and even asserting that the defendant is lying is equally impermissible.[6] In these cases, we were concerned about prosecutors improperly vouching for or against a witness and the inappropriate use of the prestige of the district attorney's office. But when a case involves numerous material witnesses and the outcome depends on which witnesses are telling the truth, reasonable latitude should be given to the prosecutor to argue the credibility of the witness—even if this means occasionally stating in argument that a witness is lying.[7] We find this true in this case. For example, one witness who had previously denied seeing anything was referred to by the prosecutor in argument as "finally" testifying "truthfully" at trial. And, she also argued that the testimony of a reluctant witness was "finally" given and he told the truth. We find nothing wrong with these statements when made in the context of arguing the credibility of a witness.

However, the prosecutor went on to describe one inmate witness as a "man of integrity" and "honor" who told the truth. Calling a witness a person of integrity and honor is indeed commenting on the character of the witness and vouching for the testimony given. This characterization of the witness's testimony "amounts to an opinion as to the veracity of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence."[8] This argument was prosecutorial error. " 'Many strong adjectives could [have been] used [to describe the testimony] but it was for the jury, and not the prosecutor, to say which witnesses were telling the truth. . . .' "[9]

---

[5]*See Ross v. State,* 106 Nev. 924, 927-28, 803 P.2d 1104, 1106 (1990) (holding that a prosecutorial statement that a defense witness is a liar is not proper argument).

[6]*See Skiba v. State,* 114 Nev. 612, 614, 959 P.2d 959, 960 (1998) (holding that it is improper for a prosecutor to state, "[t]he defendant is lying"); *Witherow v. State,* 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1998) ("The characterization of testimony as a lie is improper argument."); *see also United States v. Francis,* 170 F.3d 546, 552 (6th Cir. 1999) (holding that the prosecutor's calling the defendant "a liar" and "con man" was impermissible); *Boyd v. French,* 147 F.3d 319, 328-29 (4th Cir. 1998) (holding that it is improper for a prosecutor to comment during closing arguments with repeated references to defendant's credibility).

[7]*See, e.g., Ross,* 106 Nev. at 927, 803 P.2d at 1106 ("A prosecutor may demonstrate to a jury through inferences from the record that a defense witness's testimony is palpably untrue.").

[8]*Witherow,* 104 Nev. at 724, 765 P.2d at 1155.

[9]*Id.* (quoting *Harris v. United States,* 402 F.2d 656, 658 (1968)).

The line between appropriate argument on the credibility of a witness and improper prosecutorial argument is occasionally difficult to define. We will have to rely primarily on the trial supervision and good judgment of our district judges and look to them to determine when appropriate argument on witness credibility becomes improper vouching for a witness or the inappropriate use of the prosecutor's power. A prosecutor's use of the words "lying" or "truth" should not automatically mean that prosecutorial misconduct has occurred. But condemning a defendant as a "liar" should be considered prosecutorial misconduct. For those situations that fall in between these two examples, we must look to the attorney for the defendant to object and the district judge to make his or her ruling on a case-by-case basis.

Rowland also argues that the prosecutor asked two leading questions that were improper, and we agree. Rowland and others were members of a prison gang, the GFBD, and evidence was received that the gang members would beat up prisoners who were convicted of child molestation and prisoners who were testifying against them in this case. When cross-examining Ronnie Johnson, Smith's alibi witness, the prosecutor asked, "When did [the GFBD] stop beating up child molesters at the prison?" and "When did [the GFBD] stop beating up the witnesses in this case?" Both questions are similar to the proverbial trick question, "When did you stop beating your spouse?" Any answer will work to the witness's disadvantage and the prosecutor is in effect arguing the case to the jury, something that is much more appropriate in final argument. Although we recognize that these leading questions were related to Smith's alibi witness, we note that these questions affected Rowland because Smith and Rowland were tried together. Thus, we conclude that these questions were improper.

We have reviewed Rowland's other claims of prosecutorial misconduct and conclude that they are without merit. The instances where we have found improper prosecutorial misconduct are insufficient to amount to reversible plain error. There was overwhelming evidence of Rowland's guilt and instances of prosecutorial impropriety did not deprive Rowland of a fair trial.

II.   *The district court's conclusion that LaPeire was an accomplice as a matter of law*

Rowland asserts that the district court erred in finding that Juan LaPeire was an accomplice as a matter of law in this case for several reasons. First, Rowland argues that by finding LaPeire to be

an accomplice as a matter of law, the district court usurped the function of the jury to decide the question and lowered the State's burden of proof in violation of Rowland's due process rights. Second, Rowland argues that the district court failed to recognize that LaPeire was not charged with murder as Rowland and Smith were, and thus was not "liable to prosecution, for the identical offense[s] charged against the defendant[s]" as required by NRS 175.291. Finally, Rowland claims the instruction prejudiced him because it suggested that LaPeire was "in cahoots" with Rowland, and thus, "could [have] cause[d] the jury to discount LaPeire's admitted problems in telling the truth and motives for lying" and made LaPeire's testimony more credible.

The district court provided the jury with an "accomplice instruction," which stated that a conviction could not rest on the testimony of an accomplice alone, but that the accomplice's testimony had to be corroborated. The court then added at the end of the instruction: "The court finds as a matter of law that Juan LaPeire is an accomplice in this case."

Smith objected to this instruction and provided an alternative instruction, but Rowland failed to join Smith's objection or provide his own objection and an alternative instruction. Thus, plain error analysis is appropriate.[10]

The instruction was given as a result of NRS 175.291 and *Austin v. State*.[11] We explained in *Austin* that NRS 175.291 was a legislative declaration that "one who has participated criminally in a given criminal venture shall be deemed to have such character, and such motives, that his testimony alone shall not rise to the dignity of proof beyond a reasonable doubt."[12] Although the question of whether a witness is an accomplice is typically a question of fact, a district court should instruct the jury as a matter of law regarding a witness's accomplice status when the witness's own testimony leaves no doubt that the witness was an accomplice.[13]

This court has interpreted NRS 175.291 to define an "accomplice" as "one who is liable to prosecution for the identical offense charged against the defendant, . . . or who is culpably implicated in, or unlawfully cooperates, aids or abets in the commission of the crime charged."[14] In the present case, although LaPeire testified that he felt forced to participate in the crime, he

---

[10]*See Sipsas v. State,* 102 Nev. 119, 125, 716 P.2d 231, 235 (1986) (noting that this court may review errors that are "patently prejudicial," regardless of counsel's failure to object); *see also* NRS 178.602.

[11]87 Nev. 578, 588-89, 491 P.2d 724, 730-31 (1971).

[12]*Id.* at 588, 491 P.2d at 731.

[13]*Id.*

[14]*Potter v. State,* 96 Nev. 875, 876-77, 619 P.2d 1222, 1223 (1980).

admitted that: (1) he was present at the meeting with Irvine, Smith, and Rowland to plan the attack on Silva; (2) he stood as a lookout during the attack; (3) he helped carry a laundry bag containing Silva's television; and (4) he helped carry a bag containing Silva's food, jacket, and clock radio. Despite Rowland's contention that LaPeire was never formally charged with murder, according to LaPeire's own testimony, LaPeire was "culpably implicated in" the crime.

We conclude that this instruction was proper and that Rowland's contention that the district court usurped the jury's function is without merit. In addition, we note that we have considered Rowland's prejudicial arguments and we conclude that this instruction was not prejudicial to Rowland. The district court's finding actually raised the State's burden because the State was required to corroborate LaPeire's testimony through other witnesses. In any event, there was overwhelming evidence of Rowland's guilt in light of the several witnesses that corroborated LaPeire's testimony and directly connected Rowland to the crime.

III.  *The admissibility of hearsay statements made by deceased co-defendant Irvine*

Rowland contends that the district court erred in admitting hearsay testimony. At trial the State called Officer Rod Moore who interviewed Irvine shortly after Silva's murder. During direct examination, Officer Moore testified that Irvine had told him "I know who did it," and to "go check [Rowland's] hands." In overruling Rowland's objection, the district court admitted the first statement as an excited utterance and the second as non-hearsay showing why the investigation focused on Rowland.

Admission of an out-of-court statement based on the unavailability of the witness requires satisfaction of two criteria: "First, the Confrontation Clause usually requires the prosecution to demonstrate that the declarant is unavailable. Second, upon a showing of unavailability, the hearsay statement may be admitted if: (1) the statement satisfies the indicia of a 'firmly rooted' hearsay exception; or (2) the statement reflects 'particularized guarantees of trustworthiness.'"[15]

*Irvine's statement "I know who did it"*

The excited utterance exception contained at NRS 51.095 provides that "[a] statement relating to a startling event or condition

[15]*Bockting v. State,* 109 Nev. 103, 108, 847 P.2d 1364, 1367 (1993) (quoting *Ohio v. Roberts,* 448 U.S. 56, 63 (1980)).

made while the declarant was under the stress of excitement caused by the event or condition is not inadmissible under the hearsay rule.'' We conclude that the district court did not abuse its discretion in admitting Irvine's statement ''I know who did it.'' First, it is clear that he was under the stress of excitement caused by Silva's murder because Irvine was agitated after the event; Irvine had attacked an officer and he had to be restrained; and Irvine was crying, mumbling, and acting very irrational. Moreover, the statement came less than forty-five minutes after the murder.[16]

### Irvine's statement ''go check his hands''

Irvine's second statement was made over three hours later after Irvine had calmed down. We have recognized that ''[a] statement merely offered to show that the statement was made and the listener was affected by the statement, and which is not offered to show the truth of the matter asserted, is admissible as non-hearsay.''[17] The State argues that this statement was offered to explain why the investigators began suspecting Rowland, and further that it was necessary to tell the State's complete story. However, this statement directly implicates Rowland. In addition, the State's argument and the district court's rationale for admitting the statement relies on a technical application of the definition of hearsay that ignores the greater purpose and spirit of Nevada's evidence laws. In fact, NRS 48.035(1) provides that ''[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.'' Accordingly, we conclude that the district court erred in admitting Irvine's statement ''go check his hands'' because it is highly prejudicial as it directly implicates Rowland and thus, its probative value is substantially outweighed by the danger of unfair prejudice. Notwithstanding, we conclude that the error was harmless because there was overwhelming evidence when the numerous eyewitness testimonies are considered.[18]

### IV.   *The denial of appellant's pretrial motion for severance*

Rowland claims that the district court erred in denying his

---

[16]*See Hogan v. State,* 103 Nev. 21, 23, 732 P.2d 423, 423 (1987) (upholding a statement made one hour after the threat).

[17]*Wallach v. State,* 106 Nev. 470, 473, 796 P.2d 224, 227 (1990).

[18]*See Franco v. State,* 109 Nev. 1229, 1237, 866 P.2d 247, 252 (1993) (noting that errors concerning hearsay are subject to harmless error analysis); *see also Schoels v. State,* 115 Nev. 33, 35, 975 P.2d 1275, 1276 (1999) (noting that an error is harmless if in absence of the error the outcome would have been the same).

motion to sever the trial. Specifically, he argues that the district court abused its discretion by not severing the trial because: (1) he and Smith asserted antagonistic defenses; and (2) the jury could not compartmentalize and clearly separate the evidence against Smith and him. We disagree and conclude that the district court did not err in denying the severance motion.

NRS 174.165 provides that a defendant is entitled to a severed trial if he presents a sufficient showing of facts demonstrating that substantial prejudice would result from a joint trial. Generally, "where persons have been jointly indicted they should be tried jointly, absent compelling reasons to the contrary."[19] The ultimate issue for a court is "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants."[20] Further, a court making this decision "must consider not only the possible prejudice to the defendant but also the possible prejudice to the Government resulting from two time-consuming, expensive and duplicitous trials."[21] When challenging the district court's decision, the appellant has the "heavy burden" of showing that the district court abused its discretion.[22]

As an initial matter, the State argues that Rowland and Smith did not inform the district court of what their defenses were early enough for it to make an informed decision on the matter, and thus failed to timely and specifically move for a severance. Indeed, Rowland's motion to sever gave few clues as to the actual defenses to be presented at trial and was instead based on: (1) a possible *Bruton v. United States*[23] problem caused by the introduction of Smith's statements showing "consciousness of guilt" and the possible unavailability of Smith as a witness; and (2) the possibility that Smith's defense would consist of inculpating Rowland, thus making Smith an "extra prosecutor" against Rowland. Further, Smith informed the district court of his alibi defense before trial, but Rowland's defense was unknown until the morning of jury selection. Although Rowland's motion to sever did not specifically raise an "antagonistic defenses" or "jury compartmentalizing" argument, we note that his motion did raise the inference that Smith's defense was antagonistic and that the evidence against Smith might "spill-over" to taint the case against Rowland.

---

[19]*Jones v. State,* 111 Nev. 848, 853, 899 P.2d 544, 547 (1995).

[20]*Id.* at 854, 899 P.2d at 547.

[21]*Lisle v. State,* 113 Nev. 679, 688-89, 941 P.2d 459, 466 (1997).

[22]*Amen v. State,* 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990).

[23]391 U.S. 123 (1968).

### Antagonistic defenses

Rowland argues that his and Smith's defenses were antagonistic, warranting severance. This court has stated that defenses must be antagonistic to the point that they are "mutually exclusive" before they are to be considered prejudicial.[24] The Ninth Circuit has stated that defenses become "mutually exclusive" when "the core of the codefendant's defense is so irreconcilable with the core of [the defendant's] own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant."[25]

At the guilt phase, Rowland offered no affirmative defense but instead argued that the State's witnesses were not credible. During the penalty phase, however, he admitted beating Silva, but asserted that he lacked the intent to kill him. On the other hand, Smith's defense was that he was not present at the scene of the crime when the attack occurred. We conclude that the district court did not err in refusing to sever the trial based on antagonistic defenses because these defenses are not mutually exclusive, as a jury could accept Smith's or Rowland's defense without rejecting the other.

### Jury compartmentalizing

Rowland also contends that evidence against Smith impermissibly "spilled over" to his case because the jury could not compartmentalize evidence that was only relevant to Rowland's guilt in light of the length of the trial and dozens of witnesses and hundreds of exhibits. Rowland points to several instances in which evidence against Smith "spilled over" to him: (1) Ebel's testimony that he saw Smith get into an argument with Wade; (2) Watson's and Reid's testimony that they saw Smith with some of Silva's things in a laundry bag; (3) LaPeire's testimony that Smith called the shots for the GFBD and had offered him protection if he would keep quiet about the case; and (4) Clingempeel's testimony that Smith pressured him to lie and say Irvine had confessed.

We stated in *Lisle v. State* that "[t]he 'spillover' . . . theory involves the question of whether a jury's unfavorable impression of [one] defendant against whom the evidence is properly admitted will influence the way the jurors view the other defendant."[26]

---

[24]*Amen,* 106 Nev. at 756, 801 P.2d at 1359.

[25]*United States v. Throckmorton,* 87 F.3d 1069, 1072 (9th Cir. 1996).

[26]113 Nev. at 689, 941 P.2d at 466 (quoting *State v. Rendon,* 715 P.2d 777 (Ariz. Ct. App. 1986)).

Severance will not be granted based on "guilt by association" alone because merely having a better chance at acquittal is insufficient to establish prejudice.[27]

We conclude that Rowland's arguments amount to nothing more than his opinion that he would have a better chance at acquittal if he and Smith had separate trials. Rowland has failed to establish the requisite prejudice from the "spill-over" effect, and failed to establish that the evidence complained of would have been clearly inadmissible against him in a severed trial. One of the charges against Rowland was a conspiracy charge, and conspiracy is usually established by inference from the conduct of the parties.[28] Additionally, the district court provided some instructions on how to compartmentalize the evidence. Accordingly, we conclude that Rowland has failed to meet his heavy burden in showing that the district court abused its discretion.

We have considered Rowland's other claimed errors and conclude that they are without merit.

### CONCLUSION

We conclude that Rowland's assignments of error do not warrant relief. Accordingly, we affirm his judgment of conviction and sentence.

---

[27]*Id.*

[28]*See Thomas v. State,* 114 Nev. 1127, 1143, 967 P.2d 1111, 1122 (1998) (noting that conspiracy is seldom proven through direct evidence).