*808
 
 OPINION
 

 By the Court,
 

 Steffen, J.:
 

 Appellant Paul Robert Heglemeier was tried by a jury and convicted of conspiracy to commit robbery, attempted robbery with use of a deadly weapon, and murder in the first-degree with use of a deadly weapon. His first-degree murder conviction resulted in a life sentence with the possibility of parole, enhanced by an identical consecutive sentence for use of a deadly weapon. Heglemeier also received sentences of six years on the conspiracy count, and seven and one-half years for attempted robbery with an additional consecutive seven and one-half years for use of a deadly weapon. On appeal, Heglemeier raises a number of issues, the most significant of which challenges the sufficiency of the evidence to corroborate the testimony of his accomplice. After careful review, we are persuaded that Heglemeier was fairly tried and convicted on all counts. We therefore affirm.
 

 FACTS
 

 The fact-intensive nature of the primary issue on appeal requires a detailed recital of the facts. Certain of the facts will be addressed or reemphasized in connection with our discussion of the legal issues appearing later in this opinion.
 

 Shortly after midnight on December 15, 1988, two armed men wearing masks entered the Kopper Keg Lounge in Las Vegas. The intruders announced their intention to rob the place and ordered three adult male patrons, Mattheas, Wegneg and Earl, and a female employee, Zornes, to go to the restroom. A second female employee, Conrad, was in the kitchen while the other four occupants of the lounge were being confronted by the gunmen. Patrons Earl and Mattheas refused to obey the masked intruders. Earl commenced struggling with one of them and was shot by both gunmen. The man struggling with Earl fired once or twice, causing Earl to fall to the floor, and the other gunman then fired
 
 *809
 
 six to eight shots at the stricken patron. Both intruders then fled.
 
 [1]
 
 Mattheas ran to the front door of the lounge and saw a white Camaro leaving the area.
 

 Earl was pronounced dead at the scene. Although the deputy coroner initially observed three gunshot wounds suffered by the victim, a later autopsy revealed that Earl had sustained six bullet wounds. The body contained one .38 special bullet and five nine-millimeter bullets or bullet fragments. Nine nine-millimeter shell casings were found by investigating officers at the scene of the crime.
 

 Eyewitnesses were unable to identify or describe the gunmen because of their masks. However, Mattheas opined that the offenders were Caucasian because of the way they talked, and the witnesses agreed that one of the two men was several inches taller than the other. Patron Wegneg stated that one gunman wore blue jeans and tennis shoes, and that both were carrying duffle bags.
 

 The crime remained unsolved until June, 1990, when an anonymous informant called the Federal Bureau of Investigation and identified the perpetrators as Stephen Becker and Paul Hegle-meier. The informant also told the FBI that the vehicle used in the crime was registered to Heglemeier’s girlfriend and that it may have been light blue in color. Armed with the foregoing information from the FBI, police officers interviewed Becker during his incarceration for an unrelated crime. Becker denied involvement in the homicide and disclaimed knowing Heglemeier, a disavowal refuted by a police review of prison records revealing Heglemeier as one of Becker’s documented visitors.
 
 [2]
 

 Eventually, several inmates informed police that Becker had admitted shooting a man in the Kopper Keg Lounge in Las Vegas several years earlier. Becker allegedly told a prison informant that he and Paul Heglemeier had committed the crime and that they had both shot the victim. Becker reportedly fired his father’s .357 magnum revolver while struggling with the victim, and Heglemeier shot the ill-fated patron with a nine-millimeter pistol. The informant also advised investigating officers that Becker had indicated that the barrel on the nine-millimeter weapon was changed and possibly discarded. When Becker was released from jail on the unrelated offense, he told Heglemeier to change the
 
 *810
 
 barrel on Heglemeier’s nine-millimeter gun. Becker knew that Heglemeier had access to another nine-millimeter handgun, and, according to Becker, Heglemeier switched barrels in his presence.
 

 As a result of information obtained from the informants, police secured a search warrant and seized a .357 magnum revolver found at the home of Becker’s father. The revolver was admitted as evidence in Heglemeier’s trial.
 

 Further investigation also disclosed that Heglemeier was incarcerated in the Nevada prison system in July 1989, and that one of the females who visited him in prison was Elizabeth Wilmarth. Police were able to confirm that Wilmarth had a nine-millimeter firearm registered in her name as of February 1988, and that the weapon had been purchased by her from American Shooters Supply in Las Vegas. Joseph Montoya, an owner of the gun supply shop, testified that Heglemeier was with Wilmarth when she purchased the weapon and that, to the best of his knowledge, Heglemeier was also with her when she sold the gun back to the same dealer. Montoya’s recollection concerning the latter occasion was based upon the fact that Wilmarth came in with somebody, that he remembered her being with Paul [Heglemeier], and that he always associated Wilmarth with Heglemeier.
 

 Police were directed to the subsequent purchaser of the nine-millimeter weapon previously owned by Wilmarth and were able to secure and test the firearm. Richard Good, a police firearms examiner, testified that the nine-millimeter bullets recovered from Earl’s body were not fired from the barrel of the gun Wilmarth resold to American Shooters Supply. Good also testified that the barrel on the Smith & Wesson handgun was made of stainless steel and rifled with five lines and grooves, features not available on that particular model as originally manufactured. However, Good stated that a ballistics test of the nine nine-millimeter casings found at the crime scene proved that the Wilmarth weapon fired all of the cartridge casings. Good opined that the match was positive.
 

 According to Good, a .357 caliber handgun could chamber a .38 special bullet, and his examination of a test bullet fired from the .357 magnum revealed the same class of characteristics as the .38 caliber bullet removed from Earl’s body. Because of the damaged condition of the bullet retrieved from the body during autopsy, Good was unable to “positively” match the bullet with the .357 handgun owned by Becker’s father.
 

 Wilmarth lived with Heglemeier from about September 1987 to June of 1988 when the couple separated. She admitted purchasing a nine-millimeter handgun from American Shooters Supply in
 
 *811
 
 February of 1988, and Heglemeier admitted being with Wilmarth on the occasion of the purchase. Wilmarth testified that she kept the weapon in the bottom drawer of her bedroom dresser and that she took the gun with her when she left Heglemeier and moved to a townhouse. Wilmarth also indicated that she was in Paris, France, during the period from November 30, 1988, until approximately December 20, 1988, when she returned to Las Vegas. According to Wilmarth, she moved her personal effects, including the nine-millimeter handgun, into a bedroom at her mother’s place before she left for France. In response to questioning, however, Wilmarth could not recall specifically looking for or seeing the gun. Wilmarth also testified that she returned to Las Vegas in order to raise funds to move to Paris. Her resale of the handgun to American Shooters Supply was in furtherance of her quest for money. Wilmarth denied that Heglemeier accompanied her when she returned the weapon.
 

 Three alibi witnesses testified seeing Heglemeier at various times before, during and after the shooting at the Kopper Keg Lounge. A female friend, Debra Cohen, testified that she met Heglemeier at the Shark Club at 10:30 p.m., had several drinks with him over a period of two or three hours, and then left with him for the Stakeout, where they remained for one or two hours before Heglemeier took her home. Robert Bluthart testified that he and his brother visited with Heglemeier at the Shark Club from around 11:30 p.m. on December 14, 1988 until about midnight, when they left. Finally, Eddie Morganer stated that he saw Heglemeier leaving the Shark Club at approximately 12:30 or 1:00 a.m. on December 15, 1988 and then saw him later that same morning at the Stakeout.
 

 Heglemeier testified that he left the Shark Club with Cohen at about 12:30 a.m. on December 15, 1988, and eventually went home at around 3:30 to 4:00 a.m. After arriving home, Hegle-meier allegedly had “quite a few messages” on his answering machine from Becker stating that he had been arrested for burglary and wanted Heglemeier to arrange to bail him out of jail.
 

 Heglemeier theorized that Becker and his brother committed the offenses at the Kopper Keg Lounge and that Becker sought to implicate Heglemeier for purposes of protecting the brother, retaliating for a $100 unpaid debt and for dating Becker’s girlfriend.
 

 The jury returned a guilty verdict against Heglemeier on one count of first-degree murder with use of a deadly weapon, attempted robbery with use of a deadly weapon, and conspiracy to commit robbery. Although the State sought the death penalty, Heglemeier received the lesser sentences specified above.
 

 
 *812
 

 DISCUSSION
 

 Heglemeier raises several issues on appeal, the most important of which is the contention that Becker, Heglemeier’s accomplice, should not have been allowed to testify because of insufficient corroboration of his testimony. Although we conclude to the contrary, the issue is concededly close, thus provoking our careful scrutiny of the record.
 

 NRS 175.291(1) provides:
 

 A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.
 

 Corroborating evidence need not, of itself, establish guilt; it is sufficient if it tends to connect the defendant to the offense. Cheatham v. State, 104 Nev. 500, 504-05, 761 P.2d 419, 422 (1988). The corroborating evidence may be gleaned from the evidence as a whole as opposed to an isolated fact or circumstance.
 
 Id.
 
 at 504, 761 P.2d at 422. Moreover, we have long recognized that the corroborative evidence “may be slight in probative effect, yet its weight is for the jury, and if it tends to connect the accused with the commission of the offense, it will satisfy the statute.” State v. Hilbish, 59 Nev. 469, 479, 97 P.2d 435, 438 (1940).
 

 The corroborative evidence that tends to connect Heglemeier to the crime without resort to accomplice testimony includes: (1) Heglemeier’s moderately long-standing association and friendship with Becker, a convicted felon; (2) Heglemeier’s presence during the purchase of the nine-millimeter weapon used in the murder and his possible, if not probable, presence during the resale of the weapon after its use in the homicide; (3) Hegle-meier’s familiarity with, and various sources of access to, the nine-millimeter weapon; (4) Heglemeier’s proximity to the crime scene during the relevant time of the offense; (5) Heglemeier’s availability to commit the crime; and (6) an employment record that contradicted Heglemeier’s testimony concerning his work schedule during the month of December 1988 and that reflected no working presence at his place of employment anywhere near the time and date of the offense.
 

 Turning first to Heglemeier’s comparatively lengthy associa
 
 *813
 
 tion with Becker, it is clear that mere association with a known criminal is insufficient of itself to corroborate accomplice testimony.
 
 See, e.g.,
 
 LaPena v. Sheriff, 91 Nev. 692, 695, 541 P.2d 907, 909 (1975) (“mere association frequently has been viewed as insufficient to corroborate an established wrong-doer’s accusation”). It is, however, a factor to be considered in the totality of circumstances that tend to connect Heglemeier to the crime.
 
 Id.
 
 Heglemeier admitted to a friendly relationship with Becker that had endured for about six years. Moreover, Wilmarth testified that Heglemeier and Becker spent “more than a few times” together at the apartment Heglemeier shared with Wilmarth in 1988. As part of the totality of the circumstances presented by the trial evidence, the jury undoubtedly considered, as it had a right to do, the long-term friendship between Heglemeier and Becker as a factor in connecting Heglemeier and his friend to the commission of the instant offense. Moreover, in describing the two masked men who murdered Earl, eyewitnesses stated that one of the men was several inches taller than the other. Heglemeier and Becker are five feet eight inches and five feet eleven inches tall, respectively.
 

 The evidence clearly established that Heglemeier was present when his girlfriend, Elizabeth Wilmarth, purchased the nine-millimeter weapon that was used in Earl’s murder. Moreover, Joseph Montoya, part owner of American Shooters Supply, testified that in addition to seeing Heglemeier with Wilmarth when she purchased the gun, to the best of his knowledge, Heglemeier was also with her when she resold the gun to the same vendor thirteen days after the shooting in the Kopper Keg Lounge. Montoya testified that he was familiar with Heglemeier from having seen him in a number of settings, including shooting at the firing range and coming to the shop (American Shooters Supply) on several occasions with Wilmarth. However, Montoya was unable to testify with certainty that Heglemeier was with Wilmarth when the gun was resold to the gun shop because his belief that Heglemeier was present on the latter occasion was based upon his recollection that Wilmarth came into the store with somebody, and Montoya always associated Wilmarth with Heglemeier. The lack of certainty associated with Montoya’s belief was a matter for the jury to weigh, but the fact of the matter is that Heglemeier was aware of the gun from the very beginning, admitted to being present with Wilmarth when it was purchased, and also admitted shooting the weapon in practice. Although both Wilmarth and Heglemeier testified that Heglemeier was not present when Wilmarth resold the weapon to American Shooters Supply, and despite the fact that Wilmarth and Heglemeier had ceased living together in June 1988, Wilmarth admitted that she
 
 *814
 
 visited Heglemeier while he was in the county jail after the instant offense occurred. The inference to be drawn from her jail visits is that she still maintained at least a friendly relationship with Heglemeier.
 

 As previously noted, Heglemeier was totally familiar with the nine-millimeter weapon used in Earl’s murder and admitted to having practiced firing the handgun. The evidence also shows that Heglemeier knew, at least during the time when he and Wilmarth lived together, where Wilmarth kept the gun. Moreover, Wilmarth’s testimony was anything but a model of certainty concerning her awareness of the location of the gun she had purchased. She basically expressed uncertainty concerning the location of the weapon or when or where she last saw it prior to the time she resold it to the gun shop. Her testimony indicating that she was unable to recall many of the specifics surrounding her nine-millimeter gun tended to support the probability that Heglemeier did have access to the weapon at the relevant time period. Wilmarth also testified that she had shown Becker the gun and where it was kept. She also indicated that although Hegle-meier did not visit the townhouse where she stayed after she and Heglemeier had ended their relationship, Becker had visited her there around Thanksgiving of 1988 and may have had access to her bedroom, where the gun was located. Wilmarth stated that when she was in Paris from November 30, 1988 until December 20, 1988, the gun was with her belongings at her mother’s house, and that as far as she knew, the gun had remained in the bottom drawer of her dresser. She speculated that although she did not let anyone borrow the gun during her stay abroad, her roommate, Laura Connell, may have taken the gun to target shoot during Wilmarth’s absence. Indeed, Wilmarth’s mother testified that certain of Wilmarth’s belongings were in a room in her house, some were in her garage, and some were left in Wilmarth’s car. The point to be emphasized here is that Wilmarth’s testimony concerning the whereabouts of the gun during the critical time period was equivocal, Heglemeier had enjoyed both the access and use of the weapon for a substantial period of time and knew where Wilmarth kept it, and his friend Becker may also have had access to the weapon at or around the time of the murder. One thing is clear; the evidence forcefully demonstrated that Wilmarth’s nine-millimeter handgun was
 
 not
 
 at her mother’s house at the time of the murder on the early morning of December 15, 1988 because the trial evidence established its use in the homicide. The jury could have drawn the inference from the facts that Heglemeier had direct access to the gun or obtained it through Becker, and that Wilmarth’s uncertainties were not credible.
 

 
 *815
 
 Three alibi witnesses testified on behalf of Heglemeier. Cohen and Bluthardt admitted that they were intoxicated from drinking during the time they had separate contact with Heglemeier at the Shark Club. Cohen was not even certain that December 14 or 15 was the exact date when she was with Heglemeier. The third witness, Morganer, admitted that Heglemeier called him prior to trial to refresh his memory, and that he was certain that Hegle-meier had just completed working his shift at the Shark Club when Morganer saw him at around 12:00 or 12:30 a.m. on December 15, 1988. However, the record undermines Morganer’s testimony since Heglemeier did not work on the evening of December 14 or the early morning of December 15 at the Shark Club. Moreover, even if Morganer’s testimony were deemed credible, Heglemeier could have committed the crime at the Kopper Keg and returned to the Shark Club in time to be seen by Morganer within the general time frame indicated by Morganer’s testimony. Therefore, Morganer’s recollection, if accurate, still would not have constituted a solid alibi for Hegle-meier. Although the combined testimony of these witnesses does not tend to connect Heglemeier to the crime, it is sufficiently suspect and equivocal to place Heglemeier’s alibi in serious doubt. The jury could have found from the evidence that Hegle-meier was sufficiently close and available to the crime scene to have committed the crime and then returned to the Shark Club in a colorable attempt to create the basis for an alibi.
 

 Finally, Heglemeier’s testimony concerning his work history at the Shark Club during the month of December 1988 was not credible. Heglemeier testified that he was working an “on call” shift at the Shark Club until approximately 11:45 p.m. on the evening of December 14 and that he remained there visiting with friends until the early morning hours of December 15. The prosecutor presented Heglemeier’s time card from the Shark Club that covered the two-week period from December 11, 1988 to December 24, 1988. The card revealed that Heglemeier worked only four shifts during that period totaling only 19.9 hours, and that he did not work on either December 14 or December 15, the time frame of the murder at the Kopper Keg. This evidence directly contradicted Heglemeier’s testimony that he worked eighteen to twenty-one days at the Shark Club during the month of December 1988, and that he worked a minimum of six hours per shift. Even if the “on call” shifts were not recorded on the employee time cards (employees were allegedly not paid for this type of pre-duty time), there was no evidence presented from any source indicating that Heglemeier was indeed on call on the night of December 14. Although Heglemeier had no duty to present any evidence concerning his whereabouts at the date and
 
 *816
 
 time of the murder, it is nevertheless significant that no trial evidence contradicted the State’s documentary evidence concerning Heglemeier’s employment. Furthermore, Morganer’s testimony indicating with certainty that Heglemeier had just completed working his shift at the Shark Club on the night of December 14, 1988 was directly contradicted by Heglemeier’s time card.
 

 We conclude from the foregoing that under NRS 175.291(1) and the case authorities cited above, the district court did not err in admitting the accomplice testimony of Becker. There was sufficient trial evidence, excluding Becker’s testimony, to tend to connect Heglemeier to the Kopper Keg crimes. In that connection, we disagree with Heglemeier’s contention that the instant case is governed by Eckert v. State, 91 Nev. 183, 533 P.2d 468 (1975). In
 
 Eckert,
 
 the only evidence of an independent corroborative nature was Eckert’s admitted presence and use of his driver’s license in the purchase of two weapons. This was especially insufficient in view of independent witness testimony placing Eckert in Gallup, New Mexico, at the time of the homicide occurring in the Las Vegas area. The witness was especially credible since he was a maintenance man at a Gallup motel where Eckert was staying because the vehicle being used by the three men had broken down. In contrast, the evidence of record in the instant case not only connects Heglemeier with the purchase and resale of the nine-millimeter weapon used in the murder of Earl, but it also demonstrates that Heglemeier was untruthful concerning his testimony and that he was in a position both physically and geographically to have been present at the crime scene. Moreover, Heglemeier’s association and friendship with the convicted felon Becker was of a long-standing duration. Although the corroborative evidence here may not be compelling, it was sufficient to satisfy the demands of Nevada law.
 

 Heglemeier also challenges on hearsay grounds the admission of Earl’s death certificate as proof of the victim’s death by criminal agency. The State utilized the certificate in lieu of testimony by the medical examiner who performed the autopsy and had thereafter moved to another state. Although there was no error in the admission of the certificate, it is clear that a contrary ruling would not benefit Heglemeier as there was ample eyewitness testimony to the fact that the victim had been felled by numerous gunshot wounds, causing severe bleeding from the face, back and chest. It was also demonstrated that six bullets were removed from Earl’s lifeless body.
 

 
 *817
 
 The death certificate was admissible under NRS 51.155
 
 [3]
 
 and NRS 51.165.
 
 [4]
 
 Heglemeier contends that NRS 51.155(3) precludes the State from using the certificate as evidence, but overlooks use of the disjunctive “or” appearing between subsections 2 and 3 of the statute. The certificate is clearly admissible under either subsection 1 or 2 of the statute since the autopsy was performed as an official activity of the coroner’s office and also represented the product of matters observed during the performance of an autopsy required by law. The certificate was also properly admissible under NRS 51.165 as a record of death made to a public office pursuant to the requirements of law.
 
 [5]
 

 None of the cases cited by Heglemeier on this point are apposite since they antedate the enactment of our statutory rules of evidence and do not differentiate between the categories of public records addressed in the statutes.
 

 The death certificate was properly admitted under the statutes cited above, as a routine record prepared as a nonadversarial matter by a medical examiner in a nonadversarial setting and pursuant to a duty imposed by law.
 
 See
 
 United States v. Wilmer, 799 F.2d 495, 501 (9th Cir. 1986),
 
 cert. denied,
 
 481 U.S. 1004 (1987). The district court did not err in admitting the victim’s death certificate.
 

 Heglemeier also contends that the district court erred in not granting his motion for a mistrial based upon the State’s cross-examination of him concerning his access to, or possession of, another nine-millimeter handgun.
 

 
 *818
 
 On July 18, 1989, Heglemeier was arrested on an unrelated charge for possession of a stolen Smith & Wesson model 659 nine-millimeter handgun with a stainless steel finish. Heglemeier successfully challenged the legality of the search leading to the seizure of the weapon, and the district court in the instant case granted Heglemeier’s motion to suppress evidence concerning this particular handgun. At trial, the following exchange occurred during the State’s cross-examination of Heglemeier:
 

 Q. You didn’t switch any barrels on any nine millimeter weapons?
 

 A. Absolutely not.
 

 Q. You did have possession or access to a separate nine millimeter gun, didn’t you?
 

 Given the district court’s ruling on the suppression motion, the questions posed by the prosecutor were clearly improper. The State seeks to excuse the questions by noting that Becker repeatedly testified that Heglemeier had another nine-millimeter pistol. The argument fails since the order suppressing reference to the second nine-millimeter firearm issued after Becker had testified.
 

 Despite the impropriety of the questions, we conclude that the prosecutor’s conduct does not rise to a level requiring reversal. The judge admonished the jury, the questions constituted a very brief segment of a lengthy trial and defense counsel objected before Heglemeier responded. Moreover, while the fact that Becker had testified that Heglemeier had access to a second nine-millimeter weapon that enabled him to switch gun barrels does not excuse the prosecutor’s question, it does lessen the prejudice of the foregoing colloquy. We conclude, for the reasons stated, that the district court did not commit error in denying Hegle-meier’s motion for a mistrial.
 

 Before trial, the district court invoked the rule excluding witnesses from the courtroom prior to the time they were called to testify.
 
 [6]
 
 The provision for the exclusion of witnesses is designed
 
 *819
 
 to prevent or minimize the adaptation of testimony to that of other witnesses and to facilitate the exposure of inconsistencies bearing on the credibility of witnesses. In other words, the policy of the rule is to promote truth and expose a lack of candor or certainty. Heglemeier insists that the district court erred in permitting a rebuttal witness to testify for the State after remaining in the courtroom despite the court’s order excluding witnesses. We have previously held that prejudice is presumed when a violation of NRS 50.155 occurs unless the record demonstrates a lack of prejudice. Givens v. State, 99 Nev. 50, 55, 657 P.2d 97, 100 (1983),
 
 overruled on other grounds,
 
 Talancon v. State, 102 Nev. 294, 301, 721 P.2d 764, 768 (1988).
 

 The basis for Heglemeier’s complaint was the rebuttal testimony of witness Joanna Rash who, as a victim advocate employed by the Clark County District Attorney Victim Witness Center, had attended Heglemeier’s preliminary hearing and most of his trial. Her attendance resulted from her efforts to assist and support Earl’s family and friends. She was not scheduled or anticipated as a witness at Heglemeier’s trial. However, at trial she listened to the testimony of one of Heglemeier’s alibi witnesses, Debra Cohen, whom she had previously observed taking notes at the preliminary hearing. Rash testified that during a recess in the trial, she observed Cohen give her notes to Wilmarth outside the courtroom, and overheard Cohen tell Wilmarth that “there will be no surprises.”
 

 The State notes that it had no idea that Rash would be a trial witness and that her testimony did not relate to the testimony of other witnesses. Apparently, Rash did not inform the prosecutor of her information until after Cohen had testified. Moreover, the potential for bias on the part of Rash was exposed during cross-examination.
 

 Rash’s testimony did not violate or have the potential of violating the policy underlying NRS 50.155 since she did not address any subject treated by other witnesses. She simply testified of her observations, the relevance of which is apparent. There was no prejudice to Heglemeier; the district court did not err in allowing Rash to testify as a rebuttal witness for the State.
 

 Heglemeier contends that the district court erred in allowing the State to question alibi witnesses about their failure to inform the police about their exculpatory information. We disagree. It is permissible for the State to cross-examine witnesses on matters concerning bias, hostility, and prejudice. In concluding that the State may properly cross-examine an alibi witness concerning his or her failure to contact police before the trial, the court in King
 
 *820
 
 v. State, 748 P.2d 531, 535 (Okla. Crim. App. 1988), reasoned that cross-examination should be allowed in matters which tend to contradict, explain or discredit a witness’s testimony or verify accuracy, memory, veracity or credibility. We agree and conclude that there was no error in connection with the State’s cross-examination of Heglemeier’s alibi witnesses.
 

 Heglemeier also maintains that the prosecutor committed prejudicial misconduct when he questioned Heglemeier’s reason for bringing a bible to court with him each day.
 
 [7]
 
 The points asserted on appeal are that the prosecutor infringed upon Heglemeier’s First Amendment right to freedom of religion, that the questions were irrelevant, and that the prosecutor sought to impeach him through his religious beliefs.
 

 We do not approve of the prosecutor’s attempt to ridicule Heglemeier’s reasons for bringing his bible to court with him. Undoubtedly the jury was in a position to assess Heglemeier’s possible motives for bringing the bible to court. We nevertheless do not view the exchange between the prosecutor and Heglemeier as misconduct that prejudiced the overall fairness of the trial. The prosecutor in fact did not refer to Heglemeier’s religious beliefs,
 
 *821
 
 but only his motive for bringing the scriptures to court with him. Moreover, Heglemeier effectively parried the prosecutor’s questions and expressed plausible reasons for having the bible with him in trial.
 

 Heglemeier next contends that there was insufficient admissible evidence to support his convictions. This court will not reverse a criminal judgment on appeal if there is substantial evidence to support the jury’s verdict. Sterling v. State, 108 Nev. 391, 398, 834 P.2d 400, 404 (1992). The standard of review on appeal is whether the jury, acting reasonably, could be convinced of the defendant’s guilt beyond a reasonable doubt by the properly admissible trial evidence. As previously noted, the primary issue in this appeal concerned the propriety of admitting the testimony of accomplice Becker. As the State conceded, without Becker’s testimony, the evidence would not have warranted submitting the case to the jury. Since Becker’s testimony was properly admitted, an evidentiary synthesis resulted that fully satisfied the heavy burden of proof necessary to support a criminal conviction.
 

 Heglemeier has also sought relief on appeal on the following grounds: (1) that the State failed to establish the corpus delicti; (2) that Heglemeier was denied due process because the State proceeded on alternative theories to support a murder conviction; (3) that the lower court erred in allowing the deputy coroner to make reference to the victim’s family; and (4) that cumulative error deprived Heglemeier of a fair trial. We have carefully reviewed each of these issues and conclude that they are without merit and need not be addressed.
 

 CONCLUSION
 

 For the reasons discussed above, we have concluded that Heglemeier was fairly tried and convicted. We therefore affirm the judgments of conviction entered by the district court pursuant to the verdicts of the jury.
 

 Rose, C. J., and Shearing, J. concur.
 

 Young, J., with whom Springer, J., joins, dissenting:
 

 Respectfully, I dissent from the majority’s conclusion that sufficient corroborating evidence was presented to connect Hegle-meier to the crime and allow his conviction based upon the alleged accomplice Becker’s testimony. The majority concedes that this is a close case. In my opinion, it is too close to give benefit to any doubt. Learned Hand characterized conspiracy as “that darling of the modern prosecutor’s nursery.” Harrison v. United States, 7 F.2d 259, 263 (1925). However, “that darling”
 
 *822
 
 can never be used as an instrument to convict in our state without sufficient evidence to connect the defendant to the crime.
 

 It has long been held that a conviction cannot be sustained merely on the testimony of an accomplice. In an early English case involving the testimony of one ruffian against his cohorts, “[t]he Court, though it was admitted as an established rule of law that the uncorroborated testimony of an accomplice is legal evidence, thought it too dangerous to suffer a conviction to take place under such unsupported testimony.” R. v. Smith and Davis (1784), 1 Leach Cr. L. 479, n.(b) (4th ed. 1815). This same requirement has long been recognized in Nevada by our earliest statutes and case law, the seminal example being State of Nevada v. Waterman, 1 Nev. 453, 457 (1865) (“[Stat. 1861, 473, sec. 365] forbids the conviction of any one on the testimony of an accomplice without corroborating testimony.”). Such clear precedent should not now be forgotten in what is manifestly a desire to affirm a conviction.
 

 With gossamer threads, the majority weaves a fabric of what it terms sufficient, albeit less than compelling, evidence to connect Heglemeier to the crimes committed, above and beyond Becker’s testimony. Yet this seemingly unimpeachable logic articulated by my colleagues upon analysis is redolent with presumptions that limit the veracity of its scope.
 

 The majority begins by noting Heglemeier’s “lengthy association” with Becker. While they acknowledge that mere association is not sufficient to provide corroboration, the opinion allows association to become “a factor to be considered.” My colleagues, taking a great leap, then opine that the jury, “by inference, could have found that Heglemeier’s friendship and association with Becker extended to joint criminal activities, including the instant offense.” Guilt by association should never be approved and yet the majority in their opinion apparently considers association sufficient to connect Heglemeier with the crimes. Mere association does not indicate that one joins in all the activities of one’s associate. I find it very difficult to accept the premise that a jury, acting reasonably, could have concluded that merely because Heglemeier was a friend of Becker that Heglemeier was ipso facto connected with Becker’s crimes.
 

 My colleagues go on to elaborate on what they consider to be Heglemeier’s connection with the murder weapon. They note that Wilmarth was not entirely clear as to the location of the weapon at all times. My colleagues further note that Becker had been in Wilmarth’s house prior to the crimes and “may have had access” to the location of the gun. Finally, they point out that the weapon was not in Wilmarth’s house at the time of the crime because it was established to have been used in the crime. Again, the sum of
 
 *823
 
 the parts does not equal the whole. Simply because Wilmarth was not aware of the exact location of the weapon at all times does not put possession of the weapon in Heglemeier’s hands, nor does it give him access to the weapon. Indeed, access to a weapon does not indicate possession of the weapon. Furthermore, mere access to the weapon cannot connect a defendant to a crime. In addition, the majority strains the bounds of logic further by concluding that since Becker “may have had access” to the weapon, Heglemeier could have obtained the weapon from Becker. Such tenuous and speculative evidence should not be viewed as connecting a defendant to a crime.
 

 My colleagues also attempt to connect Heglemeier to the crime by noting that he was present when Wilmarth purchased the gun and admitted to practicing shooting the weapon. In addition, they point to Montoya’s testimony that while he was not certain, Heglemeier may have been with Wilmarth when she sold the gun. However, I find it difficult to give much weight to Montoya’s testimony. He stated that he always associated Heglemeier with Wilmarth, and therefore it was most likely Heglemeier who was with Wilmarth when she returned the gun. Since Montoya was unable to positively place Heglemeier at the shop when the gun was returned, Montoya’s testimony failed to connect Heglemeier with the crime. As in Eckert v. State, 91 Nev. 183, 533 P.2d 468 (1975), merely being present when the weapon is purchased, or for that matter sold, does not sufficiently connect a defendant to the crime.
 
 Id.
 
 at 186, 533 P.2d at 471.
 

 My colleagues vault to yet another implausible conclusion by asserting that Wilmarth’s visits to Heglemeier in jail illustrate a continuing relationship between the two and that this relationship somehow connects Heglemeier to the crime. However, my colleagues do not mention that at the time of the crime, Heglemeier and Wilmarth apparently had no relationship. They had separated six months earlier and she testified that they did not see each other socially after their separation. Consequently, the fact that she visited him while he was incarcerated does not provide a connection to the crime.
 

 My colleagues next scrutinize Heglemeier’s alibi witnesses. The majority concedes that while “the combined testimony of these witnesses does not tend to connect Heglemeier with the crime,” the less than complete credibility of the witnesses’ testimony is enough to “place Heglemeier’s alibi in serious doubt.” Assuming this to be the case, a lack of an alibi at the time of the crime is certainly not sufficient corroborative evidence to connect Heglemeier with the crime. It is sheer speculation to conclude that Heglemeier’s lack of a solid alibi thereby proved he was sufficiently close and available to the crime scene to commit the
 
 *824
 
 crime and thereafter return to the club in an attempt to create an alibi. Presumably, numerous others in the vicinity that night would have had no ironclad alibi and yet that lack does not connect any of them to the crime. Speculation never has been and never should be sufficient evidence to connect a defendant to a crime.
 

 As Justice Hugo Black once wrote, “Bad men like good men are entitled to be tried and sentenced in accordance with the law.” Green v. United States, 365 U.S. 301, 309-10 (1961) (Black, J., dissenting). NRS 175.291(1) provides that a person cannot be convicted of a crime on the basis of an accomplice’s testimony unless that testimony is sufficiently corroborated by other evidence that tends to connect the defendant to the crime. In the instant case, I cannot conclude that such sufficient evidence exists. For the purpose of resolving the legal issue presented in this appeal, whether Heglemeier did indeed commit the crimes for which he was prosecuted is irrelevant. Due process compels that he can only be convicted under the law with the required evidence. In determining whether Heglemeier received due process, the purpose of the statute must not be forgotten. In order to convict, an accomplice’s testimony alone is not sufficient. Here, I respectfully submit, there was in reality nothing more.
 

 [1]
 

 The cook, Conrad, heard an argument emanating from the bar. Peering around the corner, she saw what appeared to her to be a bar fight. Upon hearing gunshots, she sought refuge in hiding.
 

 [2]
 

 Although Becker initially denied involvement in the homicide, after concluding favorable negotiations with the State, Becker admitted that he and Heglemeier murdered Earl.
 

 [3]
 

 NRS 51.155 provides in pertinent part:
 

 Records, reports, statements or data compilations, in any form, of public officials or agencies are not inadmissible under the hearsay rule if they set forth:
 

 1. The activities of the official or agency;
 

 2. Matters observed pursuant to duty imposed by law; or
 

 3. In civil cases and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or the method or circumstances of the investigation indicate lack of trustworthiness.
 

 [4]
 

 NRS 51.165 provides: “Records or data compilations, in any form, of births, fetal deaths, deaths or marriages are not inadmissible under the hearsay rule if the report thereof was made to a public office pursuant to requirements of law.”
 

 [5]
 

 The State also contends that the certificate was admissible under NRS 51.315 because the certificate was reliable and the declarant was unavailable to testify. We elect not to reach this point because the record does not clearly establish the unavailability of the declarant.
 

 [6]
 

 NRS 50.155 provides:
 

 1. Except as otherwise provided in subsection 2, at the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order of his own motion.
 

 2. This section does not authorize exclusion of:
 

 (a) A party who is a natural person;
 

 (b) An officer or employee of a party which is not a natural person
 

 designated as its representative by its attorney; or
 

 (c) A person whose presence is shown by a party to be essential to the presentation of his cause.
 

 [7]
 

 The following exchange occurred between the prosecutor and Hegle-meier:
 

 Q. Do you typically, when you’re out on the streets, carry your bible around with you?
 

 A. No, I don’t carry it with me, sir, but I keep it in a very safe place at my house.
 

 Q. When you worked at the Shark Club did you take it to work with you?
 

 A. Certainly not.
 

 Q. What’s your reason for bringing it to this courtroom?
 

 A. Well—
 

 Q. To keep it in a safe place?
 

 A. No, not at all. I bring it to this courtroom because I feel a spiritual need to bring it with me. Sometimes I look through it and go through certain things that it says and it helps me keep my spirits up in this problem that—
 

 Q. A spiritual need or need to impress the jury?
 

 A. No. There is actually one thing that will be used later in this trial that I don’t want to talk about.
 
 *
 

 Q. So your reason for bringing the holy bible to your trial was not to impress your jury with the fact that you’re a religious God-fearing believer in the bible?
 

 *
 

 The “one thing” that Heglemeier referred to was a passage from Deuteronomy that he had defense counsel read in his closing argument, that states: “One witness is not enough to convict a man accused of any crime or offense that he may have committed. A matter must be established by the testimony of two or three witnesses.”