*1245 OPINION ON REHEARING

Per Curiam:

On July 26, 1994, this court issued an opinion in the above-captioned matter, affirming the judgment of the district court. Heglemeier v. State, 110 Nev. 806, 878 P.2d 294 (1994). Appellant has petitioned this court for rehearing. Having carefully reviewed appellant’s petition, the record on appeal, and our previous opinion, we have concluded that the previous opinion overlooked or misapprehended material matters in the record on appeal. In addition, we have determined that further clarification regarding the nature and scope of corroborative evidence is warranted. We therefore grant the petition and withdraw the opinion previously issued. We now issue this opinion in the place of our prior opinion. As we conclude that the state did not produce evidence sufficient to corroborate the testimony of appellant’s alleged accomplice, we reverse the district court’s judgment of conviction.

FACTS

On December 15, 1988, shortly after midnight, two armed men wearing ski masks entered the Kopper Keg Lounge in Las Vegas. Two employees and three patrons were in the bar at this time. One of the employees, Janet Conrad, was in the kitchen; the *1246 other employee, Joanne Zornes, was playing shuffleboard with the three patrons: John Wegeng, Don Mattheas, and Kenneth Earl. The two gunmen announced that they were robbing the bar and instructed Zornes, Mattheas, Wegeng and Earl to go into the restroom. Zornes and Wegeng followed the instructions, but Mattheas and Earl refused to go into the restroom. Instead, Earl approached the gunman closest to him and engaged in a struggle. Earl managed to push the gunman against the juke box, and the gunman fired at Earl at least once and possibly twice. The other gunman fired six to eight shots at Earl. Both gunmen then ran out of the Kopper Keg Lounge. Earl was pronounced dead at the scene. At a subsequent autopsy, one .38 special bullet was recovered, as well as five nine-millimeter bullets or bullet fragments. In addition, nine nine-millimeter cartridge cases, as well as several nine-millimeter bullets and bullet fragments, were found at the scene of the crime.
The eyewitnesses were unable to describe the gunmen because of their masks. Mattheas, however, opined that they were Caucasian because of the way that they talked. In addition, Wegeng stated that one gunman wore blue jeans and tennis shoes, and that both carried duffle bags. With regard to the gunmen’s heights, Mattheas described one gunman as “in the neighborhood of five ten, five eleven” and the other man as approximately “five five, five six.” Zornes and Wegeng, however, did not notice any particular difference in the gunmen’s respective heights. Zornes, who was close to one gunman, approximated their heights as between five feet, seven inches and five feet, nine inches. Wegeng, who was closer to the other gunman, opined that they were five feet, eleven inches or six feet tall.
The crime remained unsolved until June, 1990, when an anonymous informant called the Federal Bureau of Investigation with information about the crime. Based upon this information, police officers interviewed Stephen Becker, who was then incarcerated for an unrelated crime. Becker initially denied any involvement in the crime, but later negotiated a plea agreement with the district attorney’s office whereby he would plead guilty to second degree murder in exchange for his testimony against appellant, Paul Heglemeier. Becker then admitted that he and Heglemeier had shot Earl at the Kopper Keg Lounge.
At trial, Becker, who is five feet, eleven inches tall, stated that he had known Heglemeier for about six years but that he had not been in contact with Heglemeier for more than three years. The state introduced evidence that Heglemeier was on a list of persons whom Becker, while in prison, would allow to visit; Heglemeier, however, did not visit Becker in prison.
In recounting his version of events, Becker testified as follows: *1247 Becker and Heglemeier met at the home of Becker’s father at approximately 10:30 p.m. on December 14, 1988. No one else was present. After consuming several alcoholic drinks, they decided to rob the Kopper Keg Lounge. Becker took his father’s handgun, a .357 magnum revolver, and ensured that all six chambers were loaded. Heglemeier then drove Becker to Heglemeier’s apartment, where Heglemeier retrieved his nine-millimeter, semi-automatic handgun. They also met the getaway driver at Heglemeier’s apartment, but Becker had never met this man and did not know his name. The trio then proceeded to the Kopper Keg Lounge.
Becker, Heglemeier and the driver arrived at the Kopper Keg Lounge a few minutes after midnight, and Becker brought a large athletic bag in which to carry the money. Becker and Heglemeier put on navy blue ski masks, entered the bar, withdrew their guns, and informed everyone that they were robbing the bar. The people inside the bar got onto the floor, but thirty seconds later, Earl stood up and pushed and tackled Becker. Becker’s gun discharged, and the two men struggled for the gun; Becker’s gun may have discharged again. As Becker and Earl struggled, Heglemeier fired his gun at Earl several times. Becker and Heglemeier then fled from the bar, and the getaway driver drove them away from the premises.
According to Becker, they returned to Heglemeier’s apartment and at some point threw away their ski masks in the desert. In addition, Becker cleaned the .357 magnum and returned it to his father’s house. Becker and Heglemeier then had drinks for about forty-five minutes. Later that morning, Becker was arrested for burglarizing an automobile, and, as a consequence, spent several days in jail.
When Becker was released from custody several days later, he told Heglemeier to change the barrel on the nine-millimeter gun. Becker knew that Heglemeier had access to another nine-millimeter gun and watched Heglemeier switch the barrels.
The police obtained the .357 magnum revolver owned by Becker’s father, which, according to the state’s ballistics expert, could have chambered a .38 special bullet. After testing the revolver, the expert opined that the test bullet possessed the same class of characteristics as the .38 special bullet recovered at the autopsy. The autopsy bullet, however, was too damaged for a positive identification.
The police also tracked down a nine-millimeter semi-automatic handgun that had belonged to Heglemeier’s former girlfriend, Elizabeth Wilmarth. Wilmarth lived with Heglemeier from approximately September 1987 until June 1988, and, according to Wilmarth, Heglemeier and Becker had spent “more than a few *1248 times together” at her apartment. In February 1988, Wilmarth purchased the gun for protection from American Shooter’s Supply, and Heglemeier was with Wilmarth when she purchased the gun.
Wilmarth testified that she and Heglemeier broke up in June 1988, and that she left for Paris on November 30, 1988. In addition, Wilmarth testified that after she and Heglemeier broke up in June, they had not seen each other except for an occasional encounter at Heglemeier’s places of employment. According to Wilmarth, she and Heglemeier were not on speaking terms in December 1988, but she has tried to maintain a friendly relationship with Heglemeier and has maintained contact with him since he was arrested.
Wilmarth was not certain of her gun’s whereabouts when she was in Paris, but thought that the gun was in her dresser, which was stored at her mother’s house. At one point, however, Wilmarth also stated that she had left her belongings at her apartment. In addition, Wilmarth first testified that her roommate might have borrowed the gun while she was in Paris, but later stated that her roommate would not have had access to the gun if it had been stored at her mother’s house. Finally, Wilmarth was not sure from where she retrieved the gun before she returned it to the gun shop. She was certain, however, that she had not loaned her gun to Heglemeier. Wilmarth also stated that Becker had visited her townhouse in November 1988 and that he may have had access to the gun at that time.
One of the owners of the gun shop where Wilmarth purchased and sold her gun testified that to the best of his knowledge, Wilmarth came in with Heglemeier when she sold her gun back to the store on December 28, 1988. The store owner expressed doubt, however, and testified that he thought he remembered Heglemeier being with Wilmarth because he always associated Wilmarth with Heglemeier. Both Heglemeier and Wilmarth testified that Heglemeier was not present when Wilmarth sold the gun back in December 1988.
The state’s expert testified that the nine-millimeter bullets recovered from the crime scene and from the autopsy were all fired from the same nine-millimeter weapon and came from a barrel rifled with six lines and grooves. This expert opined that the bullets were not fired from the barrel of Wilmarth’s nine-millimeter gun because the barrel on this gun was rifled with five lines and grooves. According to this expert, the barrel on Wilmarth’s gun was probably not the original barrel, because that nine-millimeter model originally came with a barrel rifled with six lines and grooves, not five lines and grooves. In addition, the expert noted that the barrel on Wilmarth’s gun was stainless steel *1249 and that this model gun did not originally come with a stainless steel barrel. The expert also testified, however, that based upon his tests, the nine-millimeter cartridge cases recovered from the crime scene all came from Wilmarth’s gun.
At trial, Heglemeier, who stands five feet, eight inches tall, testified that he was well acquainted with Becker and that the two had met in 1985 or 1986. In addition, Heglemeier stated that his friendship with Becker was “quite rocky.” According to Heglemeier, when he and Wilmarth cohabited, he knew where she kept the nine-millimeter gun, but he never borrowed the gun from her.
With regard to the night in question, Heglemeier testified as follows: On December 14, 1988, he was “on call” as a bartender at the Shark Club. This meant that Heglemeier would arrive at work and would be available to bartend in case the bar was busy. Heglemeier arrived at the Shark Club at approximately 9:30 p.m., and by 11:30 p.m., he realized that he would not be working. He bought his friends Mike and Mitch Bluthardt a couple of drinks, and he consumed drinks with them and Debra Cohen, an acquaintance. At approximately 12:30 a.m., he and Cohen left the Shark Club; Heglemeier saw and spoke to his friend Eddie Morganer as they were leaving. Heglemeier returned home at approximately 3:30 or 4:00 a.m. and had “quite a few” messages from Becker on his answering machine. Becker had been arrested for burglary and wanted Heglemeier to bail him out of jail.
Heglemeier also presented the testimony of several alibi witnesses. Robert (“Mitch”) Bluthardt testified that on December 14, 1988, he and his brother, Mike, had built a speaker box for Heglemeier. According to Bluthardt, at approximately 11:30 p.m., after consuming a few drinks at home, he and his brother went to the Shark Club because Heglemeier had promised to buy them drinks. Heglemeier bought them each a drink, and they left at approximately midnight. Bluthardt stated that he had expected to see Heglemeier bartending, but that Heglemeier was sitting at the bar.
Debra Cohen testified that on December 14, 1988, she went to the Shark Club at approximately 10:30 p.m., saw Heglemeier, and had several drinks with him. According to Cohen, she and Heglemeier stayed at the Shark Club for two to three hours and then went to the Stakeout, another local bar. Cohen stated that she and Heglemeier spent one to two hours at the Stakeout, and then Heglemeier drove her home.
Finally, Eddie Morgaño testified that he saw Heglemeier leave the Shark Club at approximately 12:30 or 1:00 a.m. on the night in question. Morgaño stated that he then saw Heglemeier later that night at the Stakeout.
*1250 On September 16, 1991, after the trial, Heglemeier was convicted of one count each of murder in the first degree with use of a deadly weapon, conspiracy to commit robbery, and attempted robbery with use of a deadly weapon. He received a sentence of life with the possibility of parole for the murder conviction, which was enhanced with a consecutive life sentence with the possibility of parole for the use of a deadly weapon. In addition, Heglemeier received a consecutive six-year sentence for the conspiracy conviction and a consecutive seven-and-one-half-year sentence for the attempted robbery conviction, which was enhanced with a consecutive seven-and-one-half-year sentence for the use of a deadly weapon.

DISCUSSION

In order for a defendant to be convicted on the testimony of an accomplice, the state must present other, independent evidence that tends to connect the defendant with the crime:
A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant -with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.
NRS 175.291(1) (emphasis added).
Corroborative evidence “need not in itself be sufficient to establish guilt” — “it will satisfy the statute if it merely tends to connect the accused to the offense.” Cheatham v. State, 104 Nev. 500, 504-05, 761 P.2d 419, 422 (1988). In addition, corroborative evidence may be either direct or circumstantial, see, e.g., People v. Cooks, 190 Cal. Rptr. 211 (Ct. App.), cert. denied, 464 U.S. 1046 (1983), and can be taken from the evidence as a whole. Cheatham, 104 Nev. at 504, 761 P.2d at 422.
Corroborating evidence, however, must independently connect the defendant with the offense; evidence does not suffice as corroborative if it merely supports the accomplice’s testimony. If there is no independent, inculpatory evidence — evidence tending to connect the defendant with the offense, “ ‘there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to him.’” Austin v. State, 87 Nev. 578, 585, 491 P.2d 724, 728-29 (1971) (quoting People v. Shaw, 112 P.2d 241, 255 (Cal. 1941)). “[W]here the connecting evi *1251 dence ‘shows no more than an opportunity to commit a crime, simply proves suspicion, or is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of the defendant, the evidence is to be deemed insufficient.’” State v. Dannels, 734 P.2d 188, 194 (Mont. 1987) (quoting State v. Mitchell, 625 P.2d 1155, 1158 (Mont. 1980)).
In the present case, the positive, independent corroborative evidence introduced at trial is as follows: (1) The cartridge cases recovered from the crime scene came from Wilmarth’s gun; (2) Heglemeier had a close relationship with Wilmarth, accompanied Wilmarth when she purchased the gun, and was familiar with it; (3) Heglemeier knew where the gun was usually kept; (4) One witness thought that Heglemeier might have accompanied Wilmarth when she returned the gun; (5) Heglemeier was acquainted with Becker for several years and was on his list of persons who could visit him in prison; (6) An eyewitness described one gunman as approximately five feet ten or eleven inches and the other gunman as approximately five feet five or six inches: Becker is five feet, eleven inches tall, and Heglemeier is five feet, eight inches tall.
This case presents a particularly close issue with regard to corroboration. Although the state did introduce some evidence that might be construed as tending to connect Heglemeier with the crime, we conclude that the evidence is insufficient, as a matter of law, to corroborate Becker’s testimony. Although Heglemeier was familiar with Wilmarth’s gun, both Wilmarth and Heglemeier testified that he had never borrowed it and that he had not gone with Wilmarth when she sold it back to the gun store. In addition, although Wilmarth’s testimony was less than a model of clarity regarding the gun’s whereabouts during the relevant period, her testimony did not tend to connect Heglemeier with the crime. Any number of people, including Becker, could have had access to this gun.
Further, Heglemeier’s association with Becker, a known criminal, is insufficient, in and of itself, as corroborative evidence. LaPena v. Sheriff, 91 Nev. 692, 695, 541 P.2d 907, 909 (1975). Thus, even though the trial testimony established that Becker and Heglemeier had been acquainted for approximately six years, this connection with Becker, alone, does not corroborate Becker’s testimony.
Finally, although an eyewitness described the gunmen’s heights as approximating the heights of Becker and Heglemeier, two other eyewitnesses gave conflicting approximations of the *1252 gunmen’s heights. Given this conflicting information, as well as the number of people in the Las Vegas area who are roughly Heglemeier’s height, we are not satisfied that the eyewitness’ testimony regarding the gunmen’s respective heights provides sufficient corroboration.
In short, Heglemeier’s connection to Wilmarth and her gun, his association with Becker, and his height do not, when considered independently from Becker’s testimony, sufficiently connect Heglemeier to the crime. This evidence does not constitute adequate corroboration.
In addition, we find instructive our opinion in Eckert v. State, 91 Nev. 183, 533 P.2d 486 (1975). In that case, the defendant, Eckert, was charged with the murder of a man who had been shot in Las Vegas by three different weapons, including a nine-millimeter handgun and a .38 caliber handgun. An accomplice, Hilt, had previously given Eckert money for both a nine-millimeter and a .38 handgun, and Eckert had signed the required federal forms for these guns. After purchasing the guns, Eckert, Hilt, and another accomplice, Overton, decided to drive from Kansas to Las Vegas; the car, however, broke down along the way in New Mexico.
At trial, Overton testified against Eckert and stated that after the car broke down, all three of them continued on to Las Vegas and picked up the victim, who had just left the bar. According to Overton, Eckert shot the victim for no apparent reason and then ordered the others to shoot the victim. Eckert, however, testified that he stayed with the broken car while the others went to Las Vegas. Id. at 184-85, 533 P.2d at 469-70. The only evidence connecting Eckert to the murder was that Eckert had signed the federal form for one of the guns identified as a murder weapon and that Eckert was associated with Overton, who admitted that they had shot the victim. This court concluded that the evidence was not sufficient to corroborate the accomplice’s testimony. Id. at 186, 533 P.2dat471.
As in Eckert, we conclude that here, “[t]he dangers are too great in view of the self-purposes to be served by [Becker] to suggest that the contents of this record supply the needed corroboration to uphold [this] conviction.” Id. We therefore reverse the district court’s judgment of conviction.